Carlos **RODRIQUEZ,** Appellant,

v.

**STATE** of Alaska, Appellee.

No. A–228.

Court of Appeals of Alaska.

Aug. 7, 1987.

---

Sen K. Tan and Michael L. Wolverton, Asst. Public Defenders, and Dana Fabe, Public Defender, Anchorage, for appellant.

Robert D. Bacon, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Ronald W. Lorenson, Acting Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Carlos Rodriquez was convicted of twenty-five offenses, primarily for acts involving lewd and lascivious acts towards children, former AS 11.15.134, and contributing to the delinquency of a minor, former AS 11.40.130. Most of the counts arose from Rodriquez's either participating or attempting to participate in sexual acts with juvenile males. Twelve complainants testified at trial on a total of twenty-eight counts. Most of the complainants described a pattern in which Rodriquez would invite them to his house, offer them drugs, show them pornographic materials, and then attempt sexual acts with them. The testimony of one complainant provides a typical example.

According to T.J.P., he was thirteen when he met Rodriquez. He had a troubled family background and was already using illegal drugs. When T.J.P. went to Rodriquez's house, Rodriquez gave T.J.P. drugs and told him that he was attractive. Rodriquez also offered to "fix" T.J.P. up with a woman. During one visit, T.J.P. and Rodriquez went down to Rodriquez's basement where he showed T.J.P. a pornographic film. Rodriquez asked T.J.P. if the movie had given him an erection. When T.J.P. said that it had, Rodriquez asked to see it. Rodriquez then opened T.J.P.'s pants and performed fellatio on him. Next, Rodriquez showed T.J.P. a sauna in which there were pornographic materials. Rodriquez and T.J.P. removed their clothing to take a sauna. T.J.P. initially covered himself with a towel, but Rodriquez removed it. Rodriquez then performed fellatio on T.J.P. again. After initially resisting, T.J.P. complied with Rodriquez's request that T.J.P. perform fellatio on him. Finally, against T.J.P.'s resistance, Rodriquez held T.J.P.'s arms and sodomized him.

Following Rodriquez's conviction on twenty-five counts, Superior Court Judge Ralph E. Moody imposed a composite sentence of 133 years with fifty years sus-

pended, leaving eighty-three years to serve. Ridriquez now appeals his conviction and sentence, raising several issues.

## EXPERT TESTIMONY

At trial, the state presented the testimony of John B. Rabun, Jr., who was offered as an expert on sexually-exploited children. At trial, Rodriquez objected to Rabun's testimony on the ground that no expert testimony was needed because the matters about which Rabun was going to testify were within the common knowledge of the jury. He also contended that the testimony was not relevant. On appeal, Rodriquez raises two objections to the admission of Rabun's testimony. First, he claims that Rabun's knowledge and methods are not generally accepted within the scientific community, and are therefore inadmissible under *Frye v. United States*, 293 F. 1013 (D.C. Cir.1923). Second, Rodriquez contends that Rabun's testimony was improper testimony by one witness about the credibility of another witness.

Admissibility of expert testimony is governed by Alaska Evidence Rule 702, which provides in pertinent part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The decision of whether to allow a witness to testify as an expert is committed to the sound discretion of the trial court. Such decisions are reviewable only for an abuse of discretion. *Handley v. State*, 615 P.2d 627, 630 (Alaska 1980). In *Handley*, the supreme court found that it was an abuse of discretion to refuse to allow a psychologist to testify that in his opinion Handley had been in an alcoholic blackout and was unaware of what he was doing when he shot two people. Handley's proposed expert, Dr. John Baertschy, had considerable experience in treating cases of alcohol abuse, and had observed, first-hand, cases of intoxicated people whom he believed were suffering from alcoholic blackouts. Further, Dr. Baertschy had read professional journals relating to the phenomenon of alcoholic blackout. *Id.* at 629–31. In *Handley*, the state argued that the alcoholic blackout phenomenon was a novel theory which had not gained general acceptance among psychologists and psychiatrists. In reviewing this objection, the supreme court stated that this contention went to the weight, rather than the admissibility of the evidence. *Id.* at 630 n. 9.

The real question in admitting expert testimony is whether that testimony will assist the jury in reaching a just verdict. Many times the jury can be aided by background information which might tend to explain certain behavior. In *Handley,* the court concluded that it was an abuse of discretion to refuse to allow Handley to present evidence of Dr. Baertschy's observations of people whom Dr. Baertschy believed were in an alcoholic blackout, and his testimony indicating that the facts of Handley's case were consistent with an alcoholic blackout. *Id.* at 631. The court seemed to be willing to allow the testimony concerning alcoholic blackouts even though the theory had not necessarily gained general acceptance among psychologists and psychiatrists.

Rodriquez relies on *Frye v. United States,* 293 F. 1013, 1014 (D.C. Cir.1923), where the court held that expert testimony is admissible only if the deductive techniques are shown to have gained general acceptance in the relevant scientific field. A classic example of an application of the *Frye* test is found in *Pulakis v. State,* 476 P.2d 474 (Alaska 1970). In *Pulakis,* the supreme court applied the *Frye* test to the admissibility of polygraph examinations. The court concluded that the accuracy of the polygraph examination had not gained general acceptance in the relevant scientific community. *Id.* at 478–79. In *Colgan v. State,* 711 P.2d 533 (Alaska App.1985), we commented on the problem presented when a witness testifies that another witness is telling the truth. In that case, a family therapist who was counseling three alleged victims of sexual abuse was allowed to

testify that in her opinion, the witnesses had been sexually abused. *Id.* at 533–34. In *Colgan,* we concluded that Colgan's arguments appeared to have considerable merit and expressed serious doubts about the wisdom of admitting expert testimony of this type. However, Colgan had not objected to the admissibility of this testimony at trial, and we found that admission of this testimony did not amount to plain error. *Id.* at 534.

It appears to us that there is a significant distinction between presenting a witness, such as a polygraph operator, to testify that a person is telling the truth, and presenting a witness who can state that the behavior of a witness falls within a common pattern. A good example of this latter kind of testimony is presented in *State v. Middleton,* 294 Or. 427, 657 P.2d 1215 (1983). In *Middleton,* the court allowed testimony concerning the usual behavior of victims of child sexual abuse. The court stated:

> If a complaining witness in a burglary trial, after making the initial report, denied several times before testifying at trial that the crime had happened, the jury would have good reason to doubt seriously her credibility at any time. However, in this instance we are concerned with a child who states she has been the victim of sexual abuse by a member of her family. The experts testified that in this situation the young victim often feels guilty about testifying against someone she loves and wonders if she is is doing the right thing in so testifying. It would be useful to the jury to know that not just this victim but many child victims are ambivalent about the forcefulness with which they want to pursue the complaint, and it is not uncommon for them to deny the act ever happened. Explaining this superficially bizarre behavior by identifying its emotional antecedents could help the jury better assess the witness' credibility.

*Id.* 657 P.2d at 1219–20 (footnote omitted). This result appears to be consistent with other cases. *See United States v. Azure,* 801 F.2d 336, 340–41 (8th Cir.1986) (testimony about child victim's credibility im-proper, but expert testimony about patterns in child sexual abuse victims' stories admissible); *People v. Bledsoe,* 36 Cal.3d 236, 203 Cal.Rptr. 450, 457–460, 681 P.2d 291, 298–301 (Cal.1984) (evidence of rape trauma syndrome is admissible to disabuse the jury of widely held misconceptions about rape and rape victims, but not admissible to prove that a rape actually occurred in an individual case); *State v. Myers,* 359 N.W.2d 604, 609 (Minn.1984) (not abuse of discretion to admit expert testimony concerning the traits and characteristics typically found in sexually-abused children).

■ Testimony by an expert witness that purports to establish by scientific principles that another witness is telling the truth treads on dangerous legal ground. On the other hand, testimony by an expert witness which provides useful background information to aid the jury in evaluating the testimony of another witness is admissible. We conclude that the testimony of John Rabun was this latter type of testimony.

Rabun is a social worker with a master's degree. He has worked with children who have been exploited through child pornography or prostitution and child sex rings. For three years he has managed a Kentucky-based group of law enforcement officers and social workers called the Exploited and Missing Child Task Force. Rabun has worked with street children for about ten years. His knowledge of the behavior and experiences of street children is based on an interview method. While the method itself is not new, its application to street children is. Rabun stated that the purpose of the interview process is not to treat the child or to get the child to agree with the interviewer's view of what happened, but simply to get the child's story. For the past five years, Rabun has spent fifteen to twenty hours per week interviewing street children and twelve to fifteen hours per week out in the streets. Rabun authored a chapter for a book on sexually-exploited children. Over the last five years, his group has interviewed in excess of 1,600 children. Rabun also trains law enforce-

ment and other groups in how to deal with problems of exploited children.

Rabun testified that exploited children usually do not tell their whole story during the first interview, but progressively reveal more in each successive discussion. Rabun stated that it was particularly difficult for young males to reveal their involvement in sexual activities if the activities were of a homosexual nature.

Rabun described what he had found to be common characteristics among exploited children. He said that the children usually came from single-parent families where the parent's attention was distracted by multiple demands, leaving little time for the child. The children are typically between eleven and seventeen years old. Ninety percent of the exploited children are either missing or runaways. He testified that about sixty-five percent of the girls and forty-five to fifty-five percent of the boys had suffered physical or sexual abuse, or some sort of neglect or abandonment in their own homes. Neglect and abuse in their homes cause the children to downplay the exploitation by strangers because they learn to expect this as normal adult behavior. The children work themselves into situations from which they are not emotionally or experientially equipped to escape.

Rabun also testified about typical adult exploiters of children. They look to street children because street children are financially vulnerable. Often the children are drug users and the exploiter can attract the children by offering drugs and money. The exploiter also offers the child the care and attention that the child does not receive elsewhere.

Rabun was asked on direct examination whether the complainants' statements demonstrated a pattern consistent with Rabun's findings in his other investigations of exploited children. Rabun concluded that the complainants here were "no different" from the exploited children he had interviewed. He found that they were lonely and from unstable backgrounds lacking adult care and guidance. These children had turned to an exploiter who would care for them. He said that the lures here were

common for this pattern also: love, affection, and giving the child a sense of importance.

From our review of the record, we conclude that it was not an abuse of discretion to admit Rabun's testimony as background information. His testimony tended to explain the unusual behavior which was presented to the jury in this case. There can be little question that the emotional and financial pressures on runaways and street children which would cause them to repeatedly subject themselves to sexual exploitation for drugs and money are beyond the knowledge of the average juror. The fact that Rabun had frequently observed similar behavior patterns in other children in other areas of the country could be of significant use to the jury, particularly in light of Rodriquez's defense strategy which suggested that the testimony against him had been fabricated.

In general, Rabun's testimony was to the effect that the testimony of the alleged victims in this case was consistent with the patterns exhibited by sexually-exploited children which he had observed. Rabun generally made it clear that he was not speaking for the truthfulness of these particular witnesses. On cross-examination, Rodriquez attempted to establish whether these vulnerable juveniles could be subject to manipulation by police officials to get them to tell a false story. Rabun indicated that these juveniles could possibly be induced to make certain statements that were not true. However, he qualified his answer by saying that he did not believe that a male child would falsely admit to having sexual relations with an adult male. Since this testimony came in on cross-examination and defense counsel made no motion to strike the testimony, admission of this testimony is reviewable only as plain error. Alaska R. Crim. P. 47(b). In context, Rabun's testimony was only a common-sense response that a young male would probably not admit to homosexual behavior if it were untrue. We do not believe that this testimony had a significant impact on the case. Had Rabun's testimony been admitted simply to prove

this last point, we would have serious concerns. However, we do not find that admitting this testimony amounted to plain error.

## DEFENSE WITNESSES

■ Rodriquez next contends that the trial court erred in refusing to allow him to call as witnesses two police officers who had been in his home at different times and who would have testified that they had not seen drugs, pornography, or film-making equipment in Rodriquez's home. Judge Moody found that the evidence was not relevant, and would only serve to mislead the jury. See A.R.E. 401, 403. The trial court's findings on whether evidence is relevant or whether its prejudicial impact outweighs its probative value will only be reversed on appeal where they constitute an abuse of discretion. *Hawley v. State,* 614 P.2d 1349, 1361 (Alaska 1980).

In an offer of proof, Anchorage Police Officer Donald Daniels testified that he went to Rodriquez's home on February 28, 1977, in response to a burglar alarm. The police caught a burglar outside Rodriquez's house. Officer Daniels went through the house to determine if any property had been stolen. Officer Daniels stated that he did not observe any drugs or drug paraphernalia; on the other hand he stated that he was not looking for that sort of evidence. He also stated that he did not see any filming equipment or pornography. Anchorage Police Officer Richard Coffey testified that on April 20, 1978, he went to Rodriquez's residence to serve a search warrant. The purpose of the search warrant was to recover stolen property that was taken in a larceny by two juveniles. Officer Coffey stated that he did not recall seeing any drugs when he served the search warrant. He also stated that he did not recall seeing any pornographic literature, or equipment for making movies.

Neither officer indicated that he had made a thorough search of Rodriquez's residence. Both entries occurred approximately five years before trial. It does not seem particularly remarkable that neither officer saw drugs or drug paraphernalia at the time of either entry. Neither officer was looking for drugs, pornography, or film-making equipment. The fact that they did not notice any of these things on the two dates in question has little probative value to this case. We conclude that Judge Moody did not abuse his discretion in refusing to admit this testimony.

## DOUBLE JEOPARDY

Rodriquez next argues that certain of his convictions were either for the same acts or were for acts which were part of a continuous transaction. He argues that these convictions violated his constitutional protection against double jeopardy.

In *Whitton v. State,* 479 P.2d 302 (Alaska 1970), the court instructed trial judges on how to determine when two or more statutory violations amount to the same offense for double jeopardy purposes:

> The trial judge first would compare the different statutes in question, as they apply to the facts of the case, to determine whether there were involved differences in intent or conduct. He would then judge any such differences he found in light of the basic interests of society to be vindicated or protected, and decide whether those differences were substantial or significant enough to warrant multiple punishments. The social interests to be considered would include the nature of personal, property or other rights sought to be protected, and the broad objectives of criminal law such as punishment of the criminal for his crime, rehabilitation of the criminal, and the prevention of future crimes.

*Id.* at 312.

In *Tuckfield v. State,* 621 P.2d 1350, 1352 (Alaska 1981), the court concluded that conviction for both an offense and a lesser-included offense arising from the same conduct, violated the constitutional guarantee against double jeopardy. In *Tookak v. State,* 648 P.2d 1018 (Alaska App.1982), we found that Tookak could not be convicted for both rape and assault with intent to commit rape. We concluded that, under the facts of that case, the assault with intent to commit rape and the complet-

ed rape were so connected in terms of time, place, and Tookak's intent and manner of his conduct, that only one continuous assault occurred culminating in the rape of the victim. *Id.* at 1023. In *Oswald v. State*, 715 P.2d 276 (Alaska App.1986), Oswald had been convicted of three counts of sexual assault in the first degree. The first count involved digital penetration of the victim. The second count involved Oswald engaging in an act of genital intercourse with the victim. This act occurred shortly after the genital penetration. Following this act of intercourse, Oswald left the victim and went to the store. He returned and engaged in a second act of genital intercourse which was charged as Count III. We concluded that Counts I and II merged as a single offense. *Id.* at 280. However, we also concluded that there was a sufficient break in time and circumstance to warrant separate convictions on Counts II and III. *Id.* at 281.

Rodriquez's first argument concerns Counts I, V and VI, which arose from the events of one evening with a single victim, T.J.P. The facts of this incident are discussed at the beginning of this opinion. Counts I, V and VI are worded generally, and it is difficult to tell from the charging documents the specific acts to which each count refers. Count I charges Rodriquez with lewd and lascivious acts toward a child for performing fellatio on T.J.P. Count V charges Rodriquez with lewd and lascivious acts toward a child for sodomizing T.J.P. Count VI charges Rodriquez with rape for having carnal knowledge of T.J.P. Both parties to this appeal agree that Counts V and VI are for the same act, the forceful sodomy in the sauna. The state concedes that the convictions for these counts covering the same act violate *Whitton,* and acknowledges that Rodriquez is entitled to reversal on Count V, which is the lesser offense. The state's concession appears to be well-founded. *Marks v. State,* 496 P.2d 66, 67–68 (Alaska 1972).

▉ Rodriquez also contends that Count I should merge with Count VI. He argues that the crime of lewd and lascivious acts toward children is a lesser-included offense

of rape and that the acts here were part of a single transaction. It appears to us that the fellatio performed on T.J.P. was not a necessary or inevitable predecessor to the later sodomy. *Cf. Tuckfield v. State,* 621 P.2d 1350, 1352–53 (Alaska 1981) (assault charge vacated where assault with intent to commit rape and rape charges arose out of single incident). Also, according to the testimony of T.J.P., the later sodomy count involved a complete change in the character of the interaction. The fellatio count involved reluctant cooperation by T.J.P. The later sodomy count involved the use of force. We believe that these two acts are sufficiently severable to allow the entry of two convictions.

▉ Rodriquez also makes the same arguments regarding Counts II and III. Count II involved an incident where Rodriquez performed fellatio on T.J.P. during group sex. Subsequently, Rodriquez left and returned with a movie camera and filmed sex acts involving two women, another man, and T.J.P. After finishing the filming, Rodriquez sodomized T.J.P. It appears that there was a sufficient break between the activity charged in Count II and the activity charged in Count III to allow the entry of separate convictions under the reasoning of *Oswald.*

▉ Rodriquez raises similar objections with respect to Counts IX and XI. Count IX involved Rodriquez's performing masturbation on M.L.O., and Count XI involves Rodriquez's performing fellatio on M.L.O. The state concedes that these acts were part of one transaction and acknowledges that Count IX should be vacated. We find the state's concession to be well-founded. *Marks v. State,* 496 P.2d 66, 67–68 (Alaska 1972). We therefore order Count IX vacated.

▉ Rodriquez asserts similar objections regarding Counts X and XII. Count X involved Rodriquez's performing masturbation and fellatio on M.L.O. Count XII charged that Rodriquez performed sodomy with and fellatio on M.L.O. Apparently these counts refer to events of the same evening because they both specify the evening as "the night M.L.O. was clothed only

from the waist up," and it appears that M.L.O. only participated in sodomy with Rodriquez one time. According to M.L.O.'s testimony, Rodriquez rubbed M.L.O.'s penis through his pants and then performed fellatio on him while they were on the couch in the living room. Rodriquez and M.L.O. then went into the bedroom where Rodriquez persuaded M.L.O. to sodomize him. Although this was a continuous transaction, there was a completed sexual act in the living room followed by another separate sexual act in the bedroom. We believe that these acts are sufficiently distinct to support separate convictions.

 Finally, Rodriquez raises similar arguments with respect to Counts XIX and XX. Count XIX charged the rape of S.D.W. which was committed by Rodriquez's performing fellatio on S.D.W. Count XX charged attempted rape for an attempted sodomy on S.D.W. According to the testimony, S.D.W. was unwillingly handcuffed to a pole by Rodriquez. Rodriquez then pulled down S.D.W.'s pants and performed fellatio on him against his will. Then, while S.D.W. forcibly resisted, Rodriquez attempted to sodomize him. Rodriquez released S.D.W. from the pole after about an hour.

Rodriquez argues that the attempted rape is a lesser-included offense of rape, and that conviction of both offenses is barred under *Tuckfield*. However here, unlike in *Tuckfield*, the attempted rape charge was not based on acts leading up to the subsequent rape charge. It was not an initial step or an inherent part of the completed rape because the attempt followed the earlier completed rape. We find that these facts justify a conclusion that Rodriquez committed two severable sexual acts and that he could be convicted for two offenses.

## SENTENCE

 Rodriquez next argues that his sentence was excessive. The state concedes that Rodriquez's sentence on Count XX was illegal. Rodriquez was convicted on that count of attempted rape under former AS 11.15.120(a)(1). Judge Moody sentenced Rodriquez to twenty years for that count. Under former AS 11.05.020, the maximum term for an attempt was one-half of the maximum sentence for the completed crime. The maximum sentence under former AS 11.15.120(a) was twenty years. Former AS 11.15.130(c). Therefore, Rodriquez could not receive more than ten years for the attempt. We therefore order that Rodriquez's sentence be reduced to a sentence not to exceed ten years on Count XX.

Rodriquez received a total sentence of 133 years with fifty years suspended. Rodriquez argues that this sentence is excessive. Rodriquez points to *State v. Andrews*, 707 P.2d 900 (Alaska App.1985), *aff'd*, 723 P.2d 85 (Alaska 1986). Rodriquez does not argue that Judge Moody erroneously believed that he was required to impose consecutive sentences, he simply argues that his sentence is excessive under the standards set forth in *Andrews*. The state concedes that Rodriquez is entitled to have his sentence reconsidered under *Andrews*, which came out after Rodriquez was sentenced. We conclude that the state's concession that Rodriquez should be resentenced is well-founded. *Marks v. State*, 496 P.2d 66, 67–68 (Alaska 1972). We accordingly remand for resentencing. In addition to *Andrews*, we refer the trial court to *Dymenstein v. State*, 720 P.2d 42 (Alaska App.1986); *Hancock v. State*, 706 P.2d 1164 (Alaska App.1985); *Lewis v. State*, 706 P.2d 715 (Alaska App.1985); *Qualle v. State*, 652 P.2d 481 (Alaska App. 1982).

## INEFFECTIVE ASSISTANCE OF COUNSEL

 Rodriquez contends that he received ineffective assistance of counsel. Criminal defendants have the right to effective legal counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984); *Risher v. State*, 523 P.2d 421, 425 (Alaska 1974). A defense attorney's representation is constitutionally deficient if the attorney does not "perform at least as well as a lawyer with ordinary training and skill in the criminal law and ... conscientiously protect his

client's interest, undeflected by conflicting considerations." *Risher*, 523 P.2d at 424 (quoting *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir.1974)). To prevail on a claim of ineffective assistance of counsel, a defendant must show a reasonable doubt that counsel's incompetence affected the outcome of the trial. *Risher*, 523 P.2d at 424–25.

■ Rodriquez first contends that his appointed counsel had a conflict of interest under the fee arrangement which was established in this case. The state agreed to pay Rodriquez's appointed counsel $15,000. The letter summarizing the agreement also stated, "in the event that Mr. Rodriquez has funds available to compensate you additionally, you are certainly free to negotiate whatever price you can with Mr. Rodriquez." The state also agreed to pay investigative expenses up to $2,500. At the hearing on the ineffective assistance of counsel claim, defense counsel admitted that he had told Rodriquez that "a first-class job" would cost $40,000. Counsel indicated that, at that point, he thought that Rodriquez had funds available to supplement the fee. He further acknowledged asking Rodriquez to supplement the state's payments to raise his total fee to $40,000. Counsel denied threatening Rodriquez that he would suffer a long imprisonment if he did not supplement the state-paid fee. Rodriquez did pay counsel $200. Counsel acknowledged that he could have done more investigating if he had had more money to work with. Counsel asserted that Rodriquez's failure to supplement the fee did not affect his efforts on Rodriquez's behalf.

Judge Moody found that Rodriquez was not credible in his assertions about counsel's demands. Additionally, Judge Moody concluded that the fee arrangement did not create a conflict of interest and that neither the arrangement nor Rodriquez's failure to add to the fee affected counsel's representation. Judge Moody's findings are supported by the record. We see the fee arrangement in this case as being similar to situations in which private counsel agrees to take a case for $40,000, but enters an appearance upon the client's payment of $15,000. Simply because the client is unable to pay the attorney's full fee does not mean that the attorney and the client have an irreconcilable conflict of interest. Attorneys frequently are required to represent clients on less than full remuneration. Although we do not approve of the fee arrangement which was made in this case, we conclude that Judge Moody did not err in finding that counsel did not have a conflict of interest which would result in ineffective assistance of counsel.

■ Rodriquez next contends that defense counsel did not adequately prepare for the testimony of John B. Rabun, Jr., the expert in child pornography and child sexual exploitation. Rodriquez argues that his counsel was ineffective because he did not interview Rabun before trial and did not call a rebuttal expert. Rodriquez also argues that counsel did not adequately object to the admission of Rabun's testimony.

Our review of the record indicates that defense counsel objected to Rabun's testimony and that he conducted adequate cross-examination. Defense counsel testified that, prior to Rabun's testimony, he read an article that Rabun had written. Further, defense counsel felt that some of Rabun's testimony would be helpful to the defense. Additionally, there is no indication that another expert could have helped Rodriquez combat this testimony. We therefore conclude that Judge Moody's findings that Rodriquez's counsel's actions did not constitute ineffective assistance of counsel are not clearly erroneous. *Chilton v. State*, 611 P.2d 53, 55 (Alaska 1980).

■ Rodriquez next argues that his counsel was ineffective because he did not impeach a witness, Myron Ace, with a prior theft conviction. Judge Moody found that Ace was a minor witness and that his impeachment of Ace would have had minimal impact on the trial. This finding is not clearly erroneous. *Chilton*, 611 P.2d at 55.

■ Rodriquez also contends that trial counsel erred in not obtaining a protective order to exclude the testimony of witnesses who testified to other bad acts which were

not specified in the indictment. With respect to seven of the nine witnesses, this claim is raised for the first time on appeal and we decline to consider those claims. *Barry v. State*, 675 P.2d 1292, 1295–96 (Alaska App.1984).

 In his application for post-conviction relief, Rodriquez claimed that his counsel was ineffective for failing to object to the testimony of J.K. and P.M. Judge Moody found that counsel was not ineffective because the testimony of P.M. and J.K. was either admissible or was not significant enough to the trial to have resulted in acquittal had it been deleted. This finding is supported by the record and is not clearly erroneous.

Rodriquez argues that his counsel was ineffective because he failed to request a jury instruction requiring the jury to unanimously agree on a particular incident for each count in order to convict. *See Covington v. State*, 711 P.2d 1183 (Alaska App.), *modifying* 703 P.2d 436 (Alaska App.1985). In this case, as in *Covington*, it is clear that the jury rejected Rodriquez's testimony and accepted the testimony of the alleged victims. Under these circumstances, it is clear that if counsel had requested an instruction along the lines suggested in *Covington*, that instruction would not have had any impact on the case.[1]

Finally, Rodriquez argues that his counsel was ineffective because he did not object to several of the convictions on double jeopardy grounds. Since this issue is one which is capable of being raised on appeal, and was raised on appeal, it is clear that any possible ineffectiveness of counsel did not harm Rodriquez.

Rodriquez's convictions on Count V and Count IX are REVERSED, all other convictions are AFFIRMED, and the case is REMANDED for resentencing in accordance with this opinion.

---

1. We note that the *Covington* case was decided well after Rodriquez's trial was concluded.