James August **NELSON**, Appellant,

v.

**STATE of Alaska, Appellee.**

No. A–2446.

Court of Appeals of Alaska.

Nov. 9, 1989.

---

Christine Schleuss, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, An-

chorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

## OPINION

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

BRYNER, Chief Judge.

Following a jury trial, James August Nelson was convicted of one count of sexual abuse of a minor in the second degree, AS 11.41.436(a)(2), and one count of harassment, AS 11.61.120(a)(5). On appeal, Nelson contends that the trial court erred in admitting evidence of bad character, in allowing expert testimony vouching for the credibility of the alleged victim, R.H., and in finding that a defense witness was not qualified to testify as an expert. Nelson also claims that the court erred in failing to order full disclosure of certain psychological and school records. We reverse.

## FACTS

In 1985 and 1986, Nelson and his wife were active members of the South Glen Christian Church in Anchorage. Through their involvement in the church, the Nelsons became acquainted with Mrs. H. and her four sons, G.H., S.H., R.H., and E.H. Mrs. H. was not a regular churchgoer, so the Nelsons frequently gave her sons rides to church and church-related activities. The brothers often visited the Nelsons' home after church and occasionally spent the night.

In the summer of 1986, Nelson was elected pastor of his church and he moved into the pastor's house next to the church. The house was large, and the Nelsons had frequent guests. The H. brothers visited the Nelsons more frequently and began spending weekends. At the time, G.H. was thirteen years old, S.H. eleven, R.H. nine, and E.H. eight.

Nelson was openly affectionate toward the boys and by all accounts developed a paternal relationship toward them. It is undisputed that he engaged in frequent physical contact with them: the boys gave him backrubs, he wrestled with them, held them on his legs, and hugged and kissed them; he also played a game with them that involved licking their faces.

When the boys stayed in the Nelson home, they usually slept in one of the extra bedrooms. However, if they became too noisy, Nelson would separate them and one or two boys would sleep in his bed.

In September 1986, Mrs. H. received information indicating that Nelson had engaged in sexual contact with her sons. After speaking with her sons, Mrs. H. filed a report of sexual abuse with the Alaska State Troopers, who then interviewed the boys. S.H. reported that when he slept in Nelson's bed, Nelson would push his (S.H.'s) head under the covers and force his face to touch Nelson's penis. S.H. also reported instances in which Nelson kissed him, inserting his tongue into S.H.'s mouth. E.H. and R.H. reported similar incidents of touching and kissing. In addition, R.H. stated that Nelson had once grabbed his hand and placed it in contact with Nelson's penis.

As a result of these reports and an ensuing investigation, the grand jury indicted Nelson on four counts of sexual abuse of a minor in the second degree and six counts of harassment. The sexual abuse charges and three of the harassment charges related to incidents involving S.H., R.H., and E.H. The three remaining harassment charges involved three other boys, the J. brothers.

Prior to trial, the superior court granted Nelson's motion for partial severance of the charges. The court ordered that the charges relating to each alleged victim be tried separately from the charges related to the other alleged victims. Nevertheless, with respect to the charges involving the H. brothers, the court ruled that the testimony of all of the brothers would be cross-admissible, so each boy would be free to testify in the cases involving his brothers.[1]

---

1. However, the court ruled that the testimony of the J. brothers would be inadmissible in the cases involving the H. brothers and, conversely, that the H. brothers' testimony would be inadmissible at the trial of the cases involving the J. brothers.

The state elected to proceed to trial first with the three charges involving nine-year-old R.H. The first two counts charged Nelson with committing sexual abuse on R.H. by forcing him to touch his face or head to Nelson's penis and by forcing him to touch Nelson's penis with his hand. The third count charged Nelson with harassing R.H. by placing his tongue into R.H.'s mouth while kissing him.

Nelson's initial trial ended in a dead-locked jury. On retrial, Nelson was acquitted of the sexual abuse charge alleging contact between R.H.'s head and Nelson's penis. He was convicted of sexually abusing R.H. by forcing contact between his penis and R.H.'s hand. He was also convicted of harassment. The state thereafter dismissed all remaining charges against Nelson.

## EVIDENCE OF BAD CHARACTER

On appeal, Nelson first claims that the trial court erroneously allowed the state to admit evidence suggesting that he had engaged in sexual misconduct unrelated to the charges for which he was on trial. Nelson argues that this evidence was improper under Rule 404(b) of the Alaska Rules of Evidence.[2] Nelson complains of four specific instances of improper character evidence. We will consider each instance individually.

### 1. Statements Disclosing Nelson's Other Pending Charges

■ In its opening statement at trial, the prosecution disclosed that other charges were pending against Nelson for his alleged abuse of R.H.'s brothers, S.H. and E.H. Nelson moved for a mistrial, contending that disclosure of the other pending charges was improper. The trial court found nothing improper in the prosecutor's statement. On appeal, Nelson renews the objection. He claims that the disputed evidence prejudiced him by establishing his propensity to engage in similar misconduct.

However, we do not believe that the prosecutor's reference to Nelson's pending charges was improper solely because it revealed other misconduct, for the trial court had already ruled that S.H. and E.H. would be allowed to testify about Nelson's acts of abuse toward them—a ruling that Nelson does not question.[3] Nevertheless, the prosecutor's reference to the pending charges was improper because it was not an appropriate means of establishing Nelson's misconduct toward S.H. and E.H. The mere fact that Nelson had been charged with abusing S.H. and E.H. is wholly irrelevant to the question of whether he actually committed the alleged acts of abuse. *See, e.g.,* *Thrash v. State,* 158 Ga.App. 94, 283 S.E.2d 611, 612 (1981). Yet the prosecutor's remarks raised the risk that the jury might view the pending charges as evidence bolstering S.H.'s and E.H.'s claims of sexual abuse. Knowing that the state had been willing to give credence to S.H.'s and E.H.'s claims by bringing formal charges against Nelson, the jury would naturally be encouraged to accept the children's testimony.

The state defends the reference to Nelson's other charges by arguing that it was necessary to prevent the jury from falsely speculating that the children had not been deemed sufficiently credible to warrant

---

**2.** At the time of Nelson's trial, Alaska Rule of Evidence 404(b) provided:

(b) *Other Crimes, Wrongs, or Acts.*

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**3.** In support of his claim that the prosecutor's remarks amounted to nonpermissible evidence of other misconduct, Nelson cites *Thrash v. State,* 158 Ga.App. 94, 283 S.E.2d 611 (1981), and *People v. Andrews,* 149 Cal.App.3d 358, 196 Cal.Rptr. 796 (1983). These cases are distinguishable from Nelson's because they did not involve situations in which evidence of the defendants' other misconduct had been separately ruled admissible. Here, because the trial court ruled that S.H. and E.H. would be allowed to testify at R.H.'s trial, disclosure of Nelson's pending charges did not pose the risk of revealing misconduct of which the jury would not otherwise have been aware.

charges. We find this argument unpersuasive.

The possibility that the jury would draw an improper inference from a lack of information concerning the pending charges seems far more speculative and remote than the possibility that it would draw an improper inference from the affirmative knowledge that Nelson had in fact been charged. Moreover, it does not appear that the prosecutor referred to the pending charges in order to avoid jury speculation; the prosecutor's reference appears gratuitous. The state gave no advance notice of its intent to mention Nelson's pending charges, nor did it seek an advance ruling on the admissibility of this evidence.[4] It is significant that the prosecutor's remarks were entirely unsupported by evidence. While the prosecution referred to Nelson's pending charges in both its opening and closing statements, it never sought to introduce any evidence establishing the existence of those charges.

■ Although we find that the trial court erred in concluding that the prosecution's reference to Nelson's pending charges was proper, we are unable to find that this impropriety, standing alone, justified a mistrial. Had the testimony of S.H. and E.H. not been admissible, disclosure of the pending charges would undoubtedly have caused serious prejudice to Nelson's case. Because R.H.'s brothers were permitted to testify, the incremental prejudice of revealing the pending charges was minimal, at most. It appears unlikely that this information would have substantially affected the jury's verdict. Consequently, the trial court did not err in denying Nelson's motion for a mistrial.

### 2. Corrections Concerning Scope of Police Investigation

Nelson next challenges the admission of evidence pertaining to the scope of the investigation in his case. To rebut expert testimony presented by the state, Nelson called his own expert, Dr. Lee Coleman, who testified about various flaws that he perceived in the interviewing techniques employed by the police. On cross-examination, the court allowed the state to question Coleman about his knowledge of interviews conducted by the police with individuals other than the H. brothers:

Q: Were you aware that close to 35 people were contacted and interviewed with respect to this case?

A: I did not know the exact number, no.

Q: And that they covered three states including the state of Alaska?

A: No, I didn't know that.

Q: You were provided, however, interviews—were you not, with other children and the parents of other children?

A: Yes, I was.

Q: And you had the opportunity to review—and—and those interviews were conducted by Trooper Sagraves?

A: Yes.

Q: And you had an opportunity to determine whether or not the same kinds of leading questions that were asked of the [H.] boys were asked of those other children, isn't that correct?

A: Yes. I would certainly be looking for that in all the interviews I would look at.

Nelson objected, arguing that this line of questioning suggested that he had been investigated for other acts of sexual abuse involving other children. The trial court overruled the objection.

Later, during the state's rebuttal case, the prosecution returned to this topic. In examining Trooper Roy Sagraves, one of the investigating officers in Nelson's case, the state asked:

Q: How many people did you interview in this case, approximately?

A: Approximately 35 different people.

Q: And was that all just in Alaska?

4. *See, e.g., Moor v. State,* 709 P.2d 498, 505–06 (Alaska App.1985) ("[T]o enable the trial court to properly perform its function, the prosecution should be required to give advance notice to the defendant and the court, out of the presence of the jury, of its intent to utilize any evidence governed by Alaska Evidence Rule 404(b).")

A: No, it wasn't. Including Alaska, there were two other states involved.

Q: Did you interview other children?

A: Yes, I did.

Q: Did you interview the children's parents?

A: Yes, I did.

Q: Did those parents express concern—how would you compare those parents' concerns to the concerns Mrs. [H.] expressed in this case?

Nelson again objected, and at this point the trial court sustained the objection. On appeal, Nelson challenges this entire line of questioning as improper.

Nelson's challenge is well-taken. Although the trial court ultimately sustained Nelson's objection, by the time it did so, significant damage had been done. The questions asked of Coleman and Sagraves made it abundantly clear that the investigation in Nelson's case extended far beyond the H. brothers, involving other children in other states. The jury was in effect invited to speculate that similar accusations had been made against Nelson by other children and their parents.

■ We fail to perceive any legitimate justification for the challenged line of questioning. Had Coleman purported to express an expert opinion based on the totality of the state's evidence in Nelson's case, it might have been relevant to establish that he was not aware of the full extent of the investigation. However, Coleman's testimony addressed only the validity of the techniques used by the police to interview the H. brothers and their mother. In context, it is difficult to understand how Coleman's awareness of techniques used to interview other children and their parents could have had any bearing on his credibility.

■ The state argues that it was critical for the prosecution to establish that Sagraves used the same techniques in interviewing other witnesses as he used in interviewing the H. brothers. This argument is implausible. Although Coleman was critical of Sagraves' interviewing techniques, he never suggested that Sagraves had singled out the H. brothers for special treatment or that he had used techniques on them that differed from those that he typically used in comparable cases. The state offers no specific reasons why evidence pertaining to Sagraves' interviews with other children and their parents was "critical" under the circumstances, and none are apparent to us.

■ Again, we must separately consider whether the error inherent in the challenged line of inquiry was harmless. The issue is a difficult one. Although improper, the challenged inquiry was relatively brief. Nelson's second objection—when Sagraves was on the stand—was sustained. Nelson did not move for a mistrial, ask for a curative instruction, or suggest any other relief that was not granted. Given these circumstances, it seems unlikely that the error, standing alone, would have appreciably affected the jury's verdict. We therefore find it harmless. *See Love v. State,* 457 P.2d 622 (Alaska 1969).

### 3. Testimony of Diana Wyllys

■ The third instance in which Nelson claims character evidence to have been improperly admitted occurred during the testimony of Diana Wyllys. Wyllys worked for Nelson's church and had frequently been in the Nelson home during the summer of 1986. She was one of several witnesses called by the state to testify about the relationship between Nelson and the H. boys during that summer.

Prior to Wyllys' testimony, the trial court granted a protective order precluding evidence concerning Nelson's interactions with children other than the H.'s. On direct examination, Wyllys described several instances in which she observed conduct between Nelson and the H. brothers that she found suspicious or inappropriate. Thereafter, the prosecutor asked:

Q: The kind of observations you made about the defendant with the H. boys that caused you to feel—have—certain feelings, did you observe those interactions between the

defendant and any oth—the other children who were ever around the house?

A: Yeah. The—the [J.] boys occasionally would come over, and it would be the same type of hugging and holding and—the stuff that he did with the [H.] boys.

In response to Nelson's ensuing motion for a mistrial, the prosecution claimed that Wyllys' answer had come as a surprise; the prosecution indicated that it had expected Wyllys to give a negative response to the question.

On appeal, Nelson argues that the trial court erred in denying his motion for a mistrial. Nelson points to various circumstances that he contends cast doubt on the prosecution's claim of surprise. In our view, however, the record does not establish a deliberate violation of the protective order. Nor can we say that Wyllys' response was so damaging as to compel a mistrial. The question of whether to grant a mistrial is one consigned to the sound discretion of the trial court. *Brown v. State*, 693 P.2d 324, 327 (Alaska App.1984). We find no abuse of discretion here.

It is nevertheless worth observing that Wyllys' testimony did violate the protective order and amounted to yet another instance in which the jury was exposed to information suggesting that Nelson was involved in misconduct other than the offenses with which he was charged. The cumulative impact of this error remains to be considered.

4. Evidence that Nelson had been a Victim of Sexual Abuse as a Child

The final item of character evidence challenged by Nelson was admitted during the testimony of Tim Hill, a friend of Nelson's who was called as a prosecution witness and testified over defense objection that Nelson had once admitted being sexually abused as a boy by his father. The state concedes that the trial court erred in admitting this testimony.

■ Because it appears that the challenged testimony tended only to establish Nelson's prior participation in acts of sexually deviant behavior and had no legitimate relevance to the issues for which he was on trial, we find the state's concession to be well-taken. *Marks v. State*, 496 P.2d 66, 67–68 (Alaska 1972).

■ The state nevertheless maintains that the error in admitting Hill's testimony was harmless. The state argues that the prosecution's evidence of Nelson's guilt was strong and compares Nelson's case to *Stevens v. State*, 748 P.2d 771 (Alaska App. 1988), a recent decision in which we found that the erroneous admission of evidence of other sexual acts by the defendant was harmless.

We find the differences between *Stevens* and the present case to be considerable. In contrast to the overwhelming evidence of guilt presented in *Stevens*, the state's case against Nelson was not particularly strong. The various reports of sexual abuse made by the H. brothers to their mother and the police contained numerous inconsistencies. In his defense, Nelson advanced a plausible motive for the members of the H. family to fabricate their charges of sexual abuse, and he established ample opportunity for the fabrication to have occurred. Little corroborating evidence existed to substantiate the H. brothers' claims. The relative weakness of the state's case is evidenced by the first jury's inability to reach a verdict. In the second trial, the jury deliberated for three days before it was able to return a verdict, and, even then, it acquitted Nelson of one of the two felony charges.

In *Stevens*, moreover, the error that we found harmless consisted of evidence of prior sexual conduct that differed markedly from the conduct with which the defendant was charged. There seemed little likelihood, in context, that the jury would view the challenged evidence as indicating a propensity to commit the type of crime that was at issue.

The same cannot be said in Nelson's case. Nelson was charged with sexually abusing a young boy for whom he had developed a fatherly affection. The challenged testimony purported to reveal that

Nelson had acknowledged suffering similar abuse from his own father. Particularly in light of the widespread belief that sexual abusers of children are frequently people who have themselves been victims of abuse as children, the evidence of Nelson's abuse as a child carried a strong and unmistakable potential for prejudice. Applying the adage "like father, like son," members of Nelson's jury could readily have concluded that Nelson was simply following in his father's footsteps, repeating with R.H. the same behavior he had experienced at the hands of his father.

These circumstances render it difficult to conclude that Hill's testimony amounted to harmless error, even when the error is viewed in isolation. When considered in combination with the other errors that we have discussed, the error in admitting Hill's testimony clearly cannot be regarded as harmless. We believe it highly likely that the cumulative impact of the errors in this case appreciably affected the jury's verdict and deprived Nelson of a fair trial. *Thompson v. State*, 769 P.2d 997, 1005 (Alaska App.1989); *Drumbarger v. State*, 716 P.2d 6, 16 (Alaska App.1986). Accordingly, we conclude that Nelson's conviction must be reversed.

### EXPERT TESTIMONY CONCERNING VALIDITY OF VICTIM'S CLAIMS OF SEXUAL ABUSE

■ Despite our conclusion that Nelson's conviction must be reversed because of the foregoing errors, we believe it necessary to address the other issues that Nelson raises on appeal in order to provide guidance to the trial court and the parties in the event of a retrial.

Nelson challenges the expert testimony of John B. Rabun, Jr. The prosecution called Rabun, who has a master's degree in social work and is an expert in interviewing victims of child sexual abuse, to testify about the behavioral characteristics of sexually abused children. Nelson objected to Rabun's testimony as improperly vouching for the credibility of R.H. and his brothers. The trial court overruled Nelson's objections.

In *Colgan v. State*, 711 P.2d 533, 534 (Alaska App.1985), this court "entertain[ed] serious doubts as to the wisdom of routinely admitting expert testimony" concerning the validity of a child's report of sexual abuse.

We returned to the issue in *Rodriquez v. State*, 741 P.2d 1200, 1204 (Alaska App. 1987), acknowledging that, in limited circumstances, expert testimony may legitimately be used to provide a jury with background information for use in evaluating the truthfulness of a complaining witness in a child sexual abuse case. We nevertheless cautioned against the admission of case-specific testimony dealing with the truthfulness of a particular complaining witness:

> Testimony by an expert witness that purports to establish by scientific principles that another witness is telling the truth treads on dangerous legal ground. On the other hand, testimony by an expert witness which provides useful background information to aid the jury in evaluating the testimony of another witness is admissible.

*Id.*

Since the time of Nelson's trial, we have had two occasions to clarify our decision in *Rodriquez*. In *Anderson v. State*, 749 P.2d 369, 373 (Alaska App.1988) (citations omitted), we emphasized the limited scope of the *Rodriquez* holding:

> In *Rodriquez*, we recognized that several different kinds of expert testimony regarding the behavior of sexually abused children have been offered for a variety of purposes. It is therefore difficult, and perhaps improper, to formulate a single rule to cover all such cases. However, we did isolate one kind of case in which we concluded that such expert testimony is appropriate. When a complaining witness testifies that he or she has been the subject of sexual or physical abuse and the defense seeks to discredit this testimony by showing that the witness' conduct ... was inconsistent with the claimed abuse and therefore that the claim of abuse was false, the state should be permitted to offer expert testi-

mony that other members of the relevant class ... characteristically exhibit such conduct even though they are, in fact, abused.

We have been critical of testimony suggesting that children never lie about sexual abuse. Moreover, we have never authorized expert testimony seeking to establish that a person is a member of a particular class or group ... by showing that they exhibit behavioral characteristics common to that group....

In *Haakanson v. State,* 760 P.2d 1030, 1036 (Alaska App.1988), we issued a similar admonition against using expert testimony to establish that a particular witness exhibited traits characteristic of persons who have been sexually abused:

*Rodriquez* and *Anderson,* read together, permit expert testimony that responds to a defense claim that a complaining witness' conduct is inconsistent with being sexually abused by showing that similar conduct is exhibited by those who are sexually abused. These decisions do not permit testimony offered to prove that the complaining witness is sexually abused by showing that the complaining witness exhibits behavior similar to that exhibited by sexually abused children.

In the present case, Rabun's expert testimony went considerably beyond the narrow confines of permissible testimony delineated in our previous opinions. After reviewing his background and experience in interviewing sexually abused children, Rabun opened his testimony by emphasizing that the focus of his expertise lies in his ability to validate reports of sexual abuse—that is, to differentiate true reports of sexual abuse from false reports:

[T]he prime responsibility of—of—whether the investigator be a social worker or a cop, doesn't make any difference to me, but the investigative team, the prime responsibility is to determine what I call validity of the child victim, or at least at that point, alleged child victim.

Rabun went on to describe the interviewing techniques and evaluative criteria that enabled him to distinguish between true and false claims of abuse—techniques and criteria that he referred to as his "arsenal of tools that ... we should use to determine credibility." When Rabun finished describing his "arsenal," the prosecutor asked for his opinion of the H. brothers' claims, based on his review of their interviews with the police. Although Rabun did not expressly state that he believed the H. brothers' claims to be truthful, his response made it clear that he found them to be "consistent" with valid reports of abuse.

Q: Do you—based on your experience and training and your review of that material [the trooper's investigative file], was there anything that you found that stood out as falling outside the patterns of common characteristics and traits that you have described today in terms of valid reports of child sexual abuse?

A: No. I think as I indicated to the trooper, it—the—the date that he furnished me, when you look at it as a holistic pattern, was certainly consistent with the vast majority of the cases that I've participated in and/or done the interviewing. Certain techniques are different from place to place, or obviously the facts may be different from place to place and time to time.

There were inconsistencies. There were discrepancies. But they weren't the kind of discrepancies and inconsistencies that were in any way worrisome. They were the type of things that you learn are child-like. They weren't core truth inconsistencies. The core elements seemed to be consistent throughout the various statements and interviews with the kids and—and mother and whatever. It was peripheral items, or non-essential items, as I would call it, that differed from time to time. I find that holistically consistent with kids of this age range. I'm not trying to excuse in any way, but I just—I don't want to apply a burden to children that we don't even apply to adults.

A similar situation was recently faced by the supreme court of Arizona in *State v. Moran,* 151 Ariz. 378, 728 P.2d 248 (1986).

The court in *Moran* began by summarizing the rule that Arizona courts have developed for determining the admissibility of expert testimony on the characteristics of child sexual abuse victims. That rule appears similar to that adopted in our own cases, permitting background testimony but precluding case-specific opinions as to the truthfulness of the complaining witness in a particular case. As stated in *Moran:*

> Experts called to testify about behavioral characteristics that may affect an alleged victim's credibility *may not* give an opinion of the credibility of a particular witness.

*Id.* 728 P.2d at 255 (emphasis in original).

Applying this rule to the facts of the case in *Moran,* the court stated:

> [A] psychologist testified that Child Protective Services asked her "to do an evaluation to ascertain whether or not 1 felt [the daughter] has been sexually molested...." The affirmative results of that evaluation were implicit in the balance of the witness' testimony. The same psychologist gave the daughter a variety of personality tests. She then testified as follows:
>
> Q: Doctor, overall were the findings that you got with regard to [the daughter] on these objective personality tests consistent with an individual who had in fact some kind of trauma like a molest occur early in life and were now simply reacting to that in adolescence?
>
> A: Yes, it is consistent.
>
> This type of testimony—indicating that the victim's behavior is consistent with the crime having occurred—is slightly different than direct testimony on the victim's veracity. However, ... the inference offered the jury is that because this victim's personality and behavior are consistent with a molest having occurred, the crime must have been committed.
>
> This type of particularized testimony permits the expert to indicate how he or she views the credibility of a particular witness. Once the jury has learned the victim's behavior from the evidence and has heard experts explain why sexual abuse may cause delayed reporting, inconsistency, or recantation, we do not believe the jury needs an expert to explain that the victim's behavior is consistent or inconsistent with the crime having occurred.

*Id.* (citations and footnote omitted).[5]

As in *Moran,* Rabun's testimony that the H. brothers' reports of sexual abuse were consistent with valid reports of abuse effectively informed the jury that, in his expert opinion, the H. brothers were telling the truth and had been abused by Nelson. Rabun should not have been permitted to particularize his testimony in this manner. In the event of a retrial on remand, the trial court should place appropriate restrictions on the admission of expert testimony.

### REMAINING CLAIMS

Nelson's remaining claims require relatively brief attention. Nelson complains that the trial court erred in refusing to qualify Dr. Lee S. Coleman as an expert on the common characteristics of child sexual abuse victims. The trial court initially declined to qualify Coleman as an expert in this area because Coleman had not specialized, as had Rabun, in personally interviewing abuse victims. Subsequently, however, the trial court relented and allowed Coleman to testify in this area, although it did not formally qualify him as an expert.

The admissibility of expert testimony is governed by Alaska Rule of Evidence 702. That rule establishes no specific restrictions on the type of expertise required to qualify a witness as an expert. A witness may testify if "qualified as an expert by knowledge, skill, experience, training, or education...." Under the rule, the fundamental criterion is whether the witness'

5. Other recent cases have adopted views similar to those expressed in our own cases and in *State v. Moran. See, e.g., United States v. St. Pierre,* 812 F.2d 417, 419–20 (8th Cir.1987); *United States v. Azure,* 801 F.2d 336, 339–41 (8th Cir. 1986). *Cf. State v. Clements,* 241 Kan. 77, 734 P.2d 1096, 1098–99 (1987) (allowing generalized testimony that victim's behavior was "consistent" with abuse).

"scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence...." *See also Rodriquez v. State*, 741 P.2d at 1203.

In the present case, although the trial court may initially have been overly restrictive in its view of Coleman's qualifications as an expert, it ultimately permitted him to testify. Nelson's chief complaint appears to be only that the court did not specifically instruct the jury that Coleman had been accepted as an expert. Nelson cites no authority, however, for the proposition that the court was required to affirmatively instruct the jury that Coleman had been accepted as an expert. Presumably, such an instruction would have had little effect, since the jury is normally told at the end of any case that it is the sole judge of the weight and effect to be given to the testimony of a witness; the jury is also instructed that the testimony of experts is to be evaluated in the same way as the testimony of ordinary witnesses.

Nevertheless, fairness would indicate the need for equal treatment by the court of opposing experts. The jury having specifically been informed that Rabun was accepted as an expert, a similar instruction with regard to Coleman would certainly have been appropriate. Although it is questionable whether the trial court's failure to give such an instruction as to Coleman could be deemed reversible error, on remand the court should avoid placing one expert on a different footing from another in the event the issue should recur.

■ Finally, Nelson asserts that the trial court erred in failing to make adequate provisions for pretrial discovery. One aspect of this claim concerns the trial court's purported failure to disclose statements made by the H. brothers to psychological counselors. The record indicates that Nelson requested disclosure of the H. brothers' Division of Family and Youth Services (DFYS) files. The trial court, following procedures established in *Braham v. State*, 571 P.2d 631 (Alaska 1977), reviewed the DFYS files *in camera* and ordered disclosure of all but three pages. The three undisclosed pages are plainly irrelevant to the present case. The materials that the trial court ordered disclosed indicate that DFYS had no direct contact with the H. children but that the children were receiving counseling. The name of the counselor is included in the materials.

It is unclear whether Nelson actually received these discovery materials. In any event, Nelson's trial counsel made no specific request for access to the records of the counselor who was being seen by the H. brothers, and the trial court apparently had no occasion to review the counseling records *in camera* to determine their potential relevance.

The second aspect of Nelson's discovery claim relates to a request for disclosure of school records pertaining to prior reports of sexual abuse by the H. brothers' mother. This request was summarily denied prior to trial. It is unclear from the record whether the denial was based on an *in camera* review of school records, pursuant to *Braham*. To the extent that no *in camera* review was conducted, it seems likely that the court's inaction was attributable to Nelson's failure to specify precisely what records he sought to have disclosed.

With respect to both aspects of the discovery claim, we believe that, on remand, Nelson should bear the initial responsibility of specifying the information and records that he seeks to have disclosed. Once a request has been made with sufficient particularity to apprise the trial court of the materials in question, the court should conduct an *in camera* review and disclose relevant information in accordance with the guidelines established in *Braham v. State*.

The conviction is REVERSED.