Danny L. **RUSSELL**, Appellant,

v.

**STATE** of Alaska, Appellee.

No. A–5709.

Court of Appeals of Alaska.

March 28, 1997.

Averil Lerman, Anchorage, for Appellant.

Eric A. Johnson, Assistant Attorney General, Office of Special Prosecutions and Ap-

peals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

### OPINION

MANNHEIMER, Judge.

Danny L. Russell appeals his conviction for first-degree sexual assault, AS 11.41.410(a). Russell questions various evidentiary rulings made by the trial court, and he asserts that the trial court committed plain error in two of its jury instructions. Russell also challenges his sentence. We affirm.

Russell was charged with raping his wife, T.R., from whom he was separated. Russell and T.R. married in April 1993, but they separated eleven months later (in March 1994). T.R. remained in Ketchikan, and Russell went to Prince of Wales Island.

The marriage was marked by several episodes in which Russell physically abused his wife. Russell once punched his wife in the head and gave her a black eye. On a different occasion, Russell attempted to run T.R. over with a car. In August 1993, Russell attacked T.R. so brutally that she had to be medivacked to Ketchikan, where she was treated by Dr. Ernest Meloche for head trauma as well as cervical and lumbar sprains. In January 1994, Russell was convicted of harassment based on another assault on T.R..

During the marriage, T.R. sought refuge several times at the Ketchikan's women's shelter. She also received repeated medical treatment from Dr. Meloche.

In May 1994, after the couple had been separated for two months, T.R. obtained dissolution papers, completed her portion of the papers, and sent them to Russell. Russell refused to sign the papers. T.R. also obtained a restraining order that barred Russell from contacting T.R. or her children (from a prior marriage). Russell repeatedly violated this order by telephoning T.R. and writing her letters. Over the next two months, Russell sent approximately 60 letters to T.R. (essentially, one every day). One of Russell's letters from late June contained a threat to rape T.R.. Russell wrote:

Please answer [my letters]. [T.R.], do you love me or is it just for the money? You told me that you liked me to take matters into my own hands. So I guess I will even if it means raping you. I do need and want you.

On July 1, 1994, unbeknown to T.R., Russell returned to Ketchikan. Wishing to see T.R., and believing that she was living at the women's shelter, Russell set up watch at a distance from the shelter. T.R. was not living at the shelter, but by coincidence she and her son happened to walk into downtown Ketchikan near the shelter that day. Russell saw them and approached T.R.. T.R. told Russell that the restraining order was still in effect, but she and her son nevertheless accompanied Russell to a nearby McDonald's restaurant.

At the restaurant, Russell made physical advances toward T.R.. According to T.R.'s son, Russell "kept jerking [T.R.'s] head to kiss him"; T.R. "covered her face" to avoid the physical contact. The resulting commotion attracted the attention of another customer. Attempting to defuse the situation, T.R. gave Russell a "peck" on the cheek. She then told him that she wanted him to sign the dissolution papers.

After about 20 minutes at the restaurant, T.R. told Russell that she and her son were leaving for the video store. When Russell suggested that he come along, T.R. told Russell that they did not want him to accompany them. In response, Russell told T.R. that "he intended to follow her wherever she went". Fearing that Russell would follow her home (and thus discover where she was living), T.R. offered to walk Russell back to his hotel.

At the hotel, Russell invited T.R. and her son up to his room. He then gave T.R.'s son some money to play video games; the boy departed, leaving Russell and T.R. alone in Russell's room. Thereafter, Russell engaged in sexual intercourse with T.R. This act of sexual penetration formed the basis of the ensuing sexual assault charge against Russell. The State alleged that Russell had sexually assaulted T.R.

In general, a charge of first-degree sexual assault requires proof of two main elements: first, that the act of sexual penetration occurred without the victim's consent, and second, that the defendant acted recklessly with regard to the victim's lack of consent. *See Reynolds v. State*, 664 P.2d 621 (Alaska App.1983). Russell asserted that his sexual intercourse with T.R. had occurred with her consent.

At trial, T.R. testified that she repeatedly told Russell that she did not wish to have sex with him. She tried to leave the room, but Russell barred the door. T.R. stated that she repeatedly asked Russell to stop and that she cried throughout the assault. While the assault was taking place, T.R.'s son returned to Russell's hotel room and knocked on the door; T.R. attempted to speak, but Russell covered her mouth with his hand.

T.R.'s account was corroborated by a card that Russell wrote to T.R. a few days later. In this card, Russell said:

> [T]hank you so much for seeing me. I am so sorry if you know what I mean. Honest, I told myself years ago I would never ever really force you. I'm so ashamed for what I did. Don't hate me for it. I thought maybe you might have liked it. I did. Don't hate me, please. . . .

T.R. conceded, however, that she did not physically resist Russell. She explained that she decided not to resist because of Russell's past acts of violence. T.R. also conceded that she did not report the sexual assault for three days, and that, in the meantime, she made a payment on her wedding ring.

According to Russell, T.R. was the one who suggested that she and her son walk Russell back to his hotel room. When they reached the room, Russell put his arms around T.R. and kissed her; she responded by "mov[ing] in a romantic way, . . . looking out the window." About this time, Russell gave T.R.'s son money to play video games, and Russell and T.R. were left alone. Russell and T.R. kissed, and then Russell placed T.R. on the bed. T.R. told Russell, "Dan, . . . we shouldn't be doing this . . . because my counselors don't want me to have any contact with you." However, according to Russell, T.R. then willingly had sexual intercourse with him.

Russell conceded that T.R. began to cry afterwards, but he attributed T.R.'s reaction to remorse and embarrassment. Russell suggested that T.R. felt these emotions because she had promised her women's shelter counselors that she would build a life without Russell, but now she had just engaged in intimate relations with him again.

Russell relied on a similar theory to explain his letter of apology to T.R. Russell claimed that he told T.R. he was sorry because he understood her ambivalence about having sex with him and because he was ashamed of having convinced T.R. to ignore the advice of her counselors.

Before trial, Russell asked the superior court to bar the State from introducing evidence of Russell's physical abuse of T.R. while they were living together in 1993. Russell argued that such evidence would do nothing more than paint him as an abusive husband, and thus the evidence was barred by Alaska Evidence Rule 404(b). The State responded that Russell's assaults upon T.R. were relevant to explain T.R.'s behavior during the events being litigated—in particular, why she agreed to go to Russell's hotel room and why she did not physically resist Russell's sexual advance.

Superior Court Judge Thomas M. Jahnke decided to reserve his final ruling on this issue until after he heard T.R.'s testimony. However, he did indicate that it seemed likely that evidence of Russell's prior assaults on T.R. would prove relevant in the ways the State suggested.

During T.R.'s testimony, she described Russell's various physical assaults on her during their marriage. Russell did not object.

On appeal, Russell argues that this evidence should not have been admitted. However, as just explained, Judge Jahnke never made a final ruling on this evidentiary question because Russell never asked for one. When Russell raised this issue (by asking for a protective order before T.R. testified), Judge Jahnke stated that he would reserve his ruling. Later, when T.R. testified about

Russell's prior assaults, Russell did not object, nor did he remind Judge Jahnke that the judge had yet to rule on the motion for a protective order. Under these circumstances, Russell failed to preserve this issue for appeal. *Torres v. State,* 519 P.2d 788, 794–95 (Alaska 1974).

■ Even if this issue had been preserved, we would find no error. Evidence of a defendant's prior crimes is admissible to explain the relationship between two people. *See Braham v. State,* 571 P.2d 631, 641 (Alaska 1977). In particular, such evidence is relevant to explain why one person might fear another person or might submit to another person's will. *Dulier v. State,* 511 P.2d 1058, 1061 (Alaska 1973). This same rationale is employed to admit evidence of the victim's past acts of violence when a defendant is charged with assault or homicide and defends by claiming self-defense: on the issue of whether the defendant acted reasonably in using force upon the victim, the defendant is entitled to introduce evidence that he was aware of the victim's past acts of violence. *See McCracken v. State,* 914 P.2d 893, 898–99 (Alaska App.1996).

In the present case, the State alleged that Russell had engaged in sexual intercourse with T.R., that T.R. had not consented to this, and that Russell had recklessly disregarded T.R.'s lack of consent. Russell argued that his wife had consented to have sexual intercourse with him, or at least she never resisted or gave any other manifest indication that she did not consent. Russell's prior assaults on T.R. were relevant to the jury's evaluation of these issues. Such evidence could explain why T.R. would agree to accompany Russell to the hotel room and why she did not physically resist Russell when she was alone with him in the room. Moreover, Russell's past assaults on T.R. were also potentially relevant to the State's proof of Russell's recklessness—Russell's awareness of a substantial and unjustifiable possibility that T.R. felt coerced to engage in the act of sexual intercourse.[1]

■ Russell argues that, in a recent legislative amendment to Evidence Rule 404(b), the legislature indicated its intention to exclude the type of other-crimes evidence that was introduced at Russell's trial. In 1994, the legislature added subsection (b)(3) to Evidence Rule 404(b). *See* 1994 SLA, ch. 116, § 2. Evidence Rule 404(b)(3) states:

> In a prosecution for a crime of sexual assault in any degree or attempt to commit sexual assault in any degree, evidence of other sexual assaults or attempted sexual assaults by the defendant against the same or another person is admissible if the defendant relies on a defense of consent.

Russell argues that, because Rule 404(b)(3) refers to evidence of a defendant's other *sexual* assaults, the legislature must have intended to exclude evidence of a defendant's non-sexual assaults.

Russell's interpretation of subsection (b)(3) does not make sense. When the legislature enacted subsection (b)(3), its declared intent was to expand the scope of admissible evidence, not restrict it. See the declaration of purpose contained in SLA 1994, ch. 116, § 1. Evidence of Russell's physical assaults on T.R. would have been admissible under Rule 404(b) before the legislature added subsection (b)(3). We reject Russell's suggestion that subsection (b)(3) was intended to exclude evidence of a defendant's prior crimes against the victim, evidence that would have been admissible before the legislature amended the rule.

■ Russell also argues that evidence of his prior assaults on T.R. should have been excluded because Russell's attorney was not given adequate advance notice of the State's intention to introduce this evidence. In the trial court, Russell's attorney claimed that he was surprised when the State announced that it intended to elicit testimony regarding Russell's other assaults on T.R.. The prosecutor responded that, during pre-trial discovery, the State had provided Russell's attorney with information about these prior assaults.

---

1. Under AS 11.41.470(8)(A), an act of sexual penetration or sexual contact occurs without the victim's consent when the victim, "with or without resisting, is coerced by the use of force ... or by the express or implied threat of death, imminent physical injury, or kidnapping to be inflicted on anyone".

The prosecutor also pointed out that Russell's attorney must have known that the State would try to introduce this evidence because the defense attorney filed a pre-trial motion for a protective order, asking the superior court to exclude evidence of the prior assaults.

After hearing these arguments, Judge Jahnke asked Russell's attorney if he needed a continuance to prepare for the other-crimes evidence. Russell's attorney asked to be given until noon to review the information. Later, just before T.R. testified, Judge Jahnke asked the defense attorney, "What's the situation at the defense table with regard to a request for a continuance[?]" Russell's attorney answered, "I'm ready to go."

■ Assuming for purposes of argument that Russell was in fact surprised by the State's intention to introduce evidence of his prior assaults on T.R., Russell's remedy was a continuance, not exclusion of the evidence. *Des Jardins v. State*, 551 P.2d 181, 187 (Alaska 1976). *See also Bostic v. State*, 805 P.2d 344, 347–48 (Alaska 1991) (when a defendant is prejudiced by a mid-trial discovery violation, the remedy is a continuance or a mistrial, not exclusion of the evidence). Judge Jahnke offered Russell's attorney a continuance, and the defense attorney declared that he did not need one. There was no error.

■ We now turn to a separate point on appeal that is closely related to this last one. At trial, Dr. Ernest Meloche testified about the times he had treated T.R. for physical injuries. He also testified that, based on his experience with T.R., he diagnosed her as suffering from "battered woman syndrome"—a psychological condition in which a woman who is repeatedly subjected to violence at the hands of her husband or domestic partner will nevertheless stay with her abuser, being psychologically unable to sever the relationship.

■ Russell argues on appeal that Dr. Meloche was not qualified to offer an opinion regarding whether T.R. suffered from battered woman syndrome. This argument is not preserved. Dr. Meloche testified on voir dire concerning his medical qualifications and concerning his diagnosis of battered woman syndrome. Following this voir dire examination, Russell did not question Dr. Meloche's qualifications as an expert witness on these subjects. Russell argued only that Dr. Meloche's testimony would constitute an improper "validation" of T.R.'s testimony.

By failing to object to Dr. Meloche's qualifications following the voir dire, it appears that Russell implicitly acknowledged that Dr. Meloche was sufficiently qualified to offer an expert opinion on the subjects described in his testimony. Moreover, regardless of whether Russell's failure to object constituted an implicit acknowledgement of the doctor's qualifications, that failure to object constituted a waiver of this issue.

It is true that the trial court failed to make an explicit finding that Dr. Meloche was qualified to testify concerning battered woman syndrome; however, this failure did not constitute plain error. As revealed by his testimony, Dr. Meloche is a board-certified expert in emergency medicine, and he has received extensive training in battered woman syndrome. Battered woman syndrome is often relevant to the emergency treatment of women, and this diagnosis is often made by emergency-room physicians. Dr. Meloche himself had made this diagnosis many times during his years as an emergency medicine practitioner.

This testimony sufficiently established Dr. Meloche as an expert witness under the test contained in Alaska Evidence Rule 702. *See Dymenstein v. State*, 720 P.2d 42, 45 (Alaska App.1986) (Under Evidence Rule 702, "[t]he criterion in determining whether a person qualifies as an expert is whether the fact-finder can receive appreciable help from that person", and a trial judge has considerable discretion in deciding what expert testimony should be admitted.). *See also Hilburn v. State*, 765 P.2d 1382, 1385–86 (Alaska App. 1988) (upholding the trial court's ruling that, based on a physician's experience in the Indian Health Service, the physician was qualified to testify as an expert on the behavioral characteristics of Eskimo women who have undergone trauma).

■ Russell also claims that Judge Jahnke should have precluded Dr. Meloche

from testifying (or, at least, from testifying as an expert witness) because Russell did not receive pre-trial notice of this testimony. Russell relies on the current version of Alaska Criminal Rule 16(b)(1)—specifically, subsection (v)(B)—for the proposition that the State was obliged to furnish Russell with a pre-trial "written description of the substance of [Dr. Meloche's] proposed [expert] testimony". However, this version of the rule was not in effect at the time of Russell's trial. Under the version of Rule 16(b)(1) that was in effect, the State was obliged to give Russell "any reports or statements of experts made in connection with the case". The State complied with this provision by furnishing Russell with a copy of Dr. Meloche's report. This report included Meloche's diagnosis of T.R. as suffering from battered woman syndrome.

■ Russell's claim of surprise is further undercut by the fact that, prior to trial, Russell filed a motion for a protective order, asking the superior court to "preclude any evidence of Dr. Meloche's conclusions of 'battered wife syndrome'". It appears that Russell's attorney was aware of at least a substantial possibility that the State would call Dr. Meloche as an expert witness.[2]

■ Finally, Russell argues that even if his procedural objections to Dr. Meloche's testimony are not well-taken, Dr. Meloche nevertheless should not have been allowed to testify about his diagnosis of T.R. as a battered woman. According to Russell, when Dr. Meloche described battered woman syndrome and diagnosed T.R. as suffering from this condition, the doctor improperly vouched for T.R.'s credibility. Russell likens Dr. Meloche's testimony to the psychological "profile" evidence that this court rejected in such cases as Cox v. State, 805 P.2d 374, 377–79 (Alaska App.1991), and Haakanson v. State, 760 P.2d 1030, 1036 (Alaska App.1988).

Cox and Haakanson prohibit the State from introducing evidence that there is a psychological "profile" characteristic of sexual abuse or sexual assault victims to prove that the victim in a particular case fits this profile, and thus that the victim must be telling the truth when he or she claims to have been abused or assaulted. However, Dr. Meloche's testimony did not violate this rule.

■ Although the State can not use psychological profile evidence as an offensive weapon, the State is entitled to introduce "profile" testimony in response to a defense claim that the victim's conduct was inconsistent with a claim of sexual assault or sexual abuse. Haakanson, 760 P.2d at 1036; Rodriquez v. State, 741 P.2d 1200, 1203–05 (Alaska App.1987). Russell claimed that T.R.'s conduct before, during, and after her encounter with Russell in the hotel room was inconsistent with her allegation of rape. The State was therefore entitled to introduce evidence explaining how T.R.'s behavior was not necessarily inconsistent with the State's allegation of sexual assault. Dr. Meloche's description of battered woman syndrome and his diagnosis of T.R. as suffering from this syndrome were relevant and admissible on this issue.[3]

■ Russell argues that, assuming Dr. Meloche's testimony was admissible, the trial judge should have given the jury a special instruction limiting the jurors' consideration of this testimony. As Russell concedes on appeal, his trial attorney did not ask for such an instruction. Thus, Russell must establish that the failure to give a limiting instruction was plain error.

To prove plain error, Russell must establish that the court's failure to act was a manifest error, obvious to any competent lawyer or judge. Massey v. State, 771 P.2d 448, 453 (Alaska App.1989); Carman v.

---

2. We again note that, even assuming the State had violated its duty of pre-trial disclosure, the remedy would have been a continuance of Russell's trial, not preclusion of Dr. Meloche's testimony. Des Jardins, 551 P.2d at 187.

3. In two conclusory sentences, Russell argues that testimony about battered woman syndrome does not meet the Frye test for admissibility of

scientific evidence. Frye v. United States, 293 F. 1013 (D.C.Cir.1923); Contreras v. State, 718 P.2d 129 (Alaska 1986). This sort of briefing is not adequate to preserve an issue, Petersen v. Mutual Life Insurance Co. of New York, 803 P.2d 406, 410 (Alaska 1990), particularly an issue that was not raised in the trial court.

*State*, 658 P.2d 131, 137 (Alaska App.1983); *Marrone v. State*, 653 P.2d 672, 675–681 (Alaska App.1982). We find no such error here. The relevance of Dr. Meloche's testimony about battered woman syndrome was fairly clear; it explained why T.R. might stay in an abusive relationship and place herself in situations where she could be abused. The relevance of Russell's prior physical abuse of T.R. was also fairly clear; it explained why T.R. might not physically resist Russell's attempt to have sexual intercourse with her. Russell does not contend that the prosecution attempted to misuse this evidence by arguing pure propensity to the jury.

Moreover, to prove plain error, Russell must show that there is no apparent reason for his attorney's failure to seek a limiting instruction. *Massey*, 771 P.2d at 453; *Potts v. State*, 712 P.2d 385, 394 n. 11 (Alaska App.1985). In *Wortham v. State*, 689 P.2d 1133 (Alaska App.1984), this court rejected a similar claim of plain error based on a trial court's failure to give a limiting instruction concerning the defendant's prior criminal conviction. This court concluded that "[the defense attorney] might have felt that a limiting instruction was not necessary and would only have drawn more attention to the conviction." *Wortham*, 689 P.2d at 1139. The record in Russell's case leads to the same conclusion.

▮▮▮▮▮▮ Russell next argues that the trial court erroneously allowed T.R.'s friend, Connie Taylor, to testify concerning T.R.'s first complaint that she had been raped. Russell concedes that hearsay evidence of a victim's first report of a sexual assault is admissible. *See Greenway v. State*, 626 P.2d 1060 (Alaska 1980); *Nitz v. State*, 720 P.2d 55, 62 (Alaska App.1986). However, Russell argues that Taylor was allowed to exceed the proper scope of this hearsay exception when she described T.R.'s report in some detail. Having examined the record, we conclude that even if Taylor's testimony exceeded the proper scope of the "first complaint" hearsay exception, the error was harmless. T.R. had already testified to all of the details mentioned by Taylor.

▮▮▮▮▮ Russell's next point on appeal is that the trial court erroneously precluded Russell from presenting the testimony of his ex-wife, Rosemary Morris. Morris was prepared to testify that, during her fourteen years of marriage to Russell, Russell never beat her. Russell argues that Morris's testimony should have been admitted under Alaska Evidence Rule 404(a)(1).

Evidence Rule 404(a)(1) allows a defendant to offer evidence of "a relevant trait of character" to prove that he or she acted in conformity with that trait of character during the episode in question. Under Rule 404(a)(1), it appears that Russell was entitled to introduce evidence of his character for peacefulness or non-violence; further, Morris appears to have been qualified to offer an opinion on Russell's character. However, Russell's attorney expressly told the court that he was not offering Morris's testimony for this purpose: "I [will not be] asking for any of her opinions. I'm not [presenting] any character witnesses about Mr. Russell's—that he is, you know—I'm not having her say [that] he's not a violent person. I'm just saying that she was not beat[en] in [14] years of marriage."

Thus, even though Russell argues on appeal that Morris's testimony was admissible under Evidence Rule 404(a)(1) to prove Russell's character for non-violence, the record shows that Russell's trial attorney explicitly announced that he had chosen not to offer Morris's testimony (or any other evidence) for the purpose of establishing Russell's character. That is, the argument Russell makes on appeal was not preserved in the trial court.

In the trial court, Russell's sole argument in favor of Morris's testimony was that if Russell had not beaten or raped an earlier wife, he was not likely to have beaten or raped a later wife. With Russell's attorney declaring that he intended to make no assertion about Russell's character, Judge Jahnke properly rejected this offer of proof.

▮▮▮▮ Russell's next point on appeal concerns the jury instruction on the meaning of "recklessly". As noted above, one of the State's elements of proof was that Russell recklessly disregarded the fact that T.R. did

not consent to the act of sexual intercourse. Judge Jahnke instructed the jury on the meaning of "recklessly" as follows:

A person acts "recklessly" with respect to a circumstance described by the law when the person is aware of and consciously disregards a substantial and unjustifiable risk that the circumstance exists. The risk must be of such a nature and such a degree that disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who is unaware of a risk of which the person would have been aware had he or she not been intoxicated acts recklessly with respect to that risk.

This language is taken from AS 11.81.900(a)(3). Russell's trial attorney made no objection to this instruction, but on appeal Russell argues that this instruction was plain error.

Russell asserts that this instruction contains "convoluted clauses" and that it is "full of self-importance and devoid of clarity". We disagree. While this instruction requires a closer reading than the morning newspaper, the jurors were presumably aware of their duty to read the instructions closely. Moreover, the syntax of this instruction is more straightforward than many of the instructions commonly given to jurors.

Russell argues that the instruction contains "numerous terms of art". In particular, Russell notes that the instruction does not define "unjustifiable risk", nor does it define the concept of a "gross deviation from the standard of conduct that a reasonable person would observe in the situation". While these phrases may constitute "terms of art", all the words they comprise are part of everyday English.

It is true that the instruction did not provide definitive answers to the questions the jury faced: "What standard of conduct would a reasonable person have observed in Russell's situation?", "Given that standard, did Russell take an unjustifiable risk that T.R. was not consenting to the act of sexual intercourse?", and "If Russell did deviate from a reasonable standard of conduct, was Russell's deviation from that standard of conduct minimal or gross?" These are necessarily questions of fact and of degree; they can not be answered in a jury instruction. But the challenged instruction fulfilled its function of informing the jury of the questions that needed to be asked and answered.

Russell fails to suggest how the terms used in the challenged instruction might have been better defined, nor does he cite any case law holding that it is error to instruct a jury using these terms. In fact, from perusing criminal law texts, it can readily be seen that the definitions of "recklessly" and "with criminal negligence" contained in AS 11.81.900(a)(3) and (a)(4) are far more precise than the words employed at common law to define the concept of criminal negligence to juries. See, for example, the discussion found in Wayne R. LaFave and Austin W. Scott, Jr., *Substantive Criminal Law* (1986), § 3.7(a)–(b), Vol. 1, pp. 326–333, and the discussion found in R. Perkins & R. Boyce, *Criminal Law* (3rd ed.1982), p. 107–08. In sum, we find no plain error.

■ Russell next argues that plain error occurred during the prosecutor's rebuttal summation to the jury. The issue arose in the following way:

Russell took the stand at trial. During his cross-examination, he admitted (without objection) that he had read the police reports, had discussed them with his attorney, and had prepared his testimony before he took the stand. Later, during summation, Russell's attorney argued to the jury that Russell's version of events should be credited because it was consistent with the testimony given by two government witnesses: T.R.'s son and a state trooper.

In rebuttal, the prosecutor argued that the consistency between Russell's testimony and the boy's testimony did not prove that Russell's testimony was believable:

I want to talk to you again about Dan Russell's testimony. [Defense counsel] told you that Dan Russell's testimony was completely consistent with what [T.R.'s son] testified to, [and that] it was completely consistent with what he had told the troopers before. Of course it was consistent. Do you think Dan Russell would

get on the stand and place himself in a position where he could be cross-examined about the statements he had made before to the troopers and make inconsistent ones? Do you think he would get on the stand and call a 12–year–old child a liar[?]

Of course he's not going to do that. What he's going to do is take a look at what he can get away with. And he's going to carefully craft and tailor his testimony so that it is consistent.... Place yourself in the shoes of Mr. Russell, who has [forcibly] had sex with ... his wife and has been charged with [this crime]. And in his possession [are] the testimony that [T.R.] is going to give, [the] testimony that [her son] is going to give, and [the] testimony that the trooper is going to give. How would you testify if you were going to convince a jury untruthfully that you didn't do it?

Russell made no objection to this argument. However, on appeal, Russell asserts that the prosecutor's argument was plain error.

Russell argues that the prosecutor's remarks constituted unfair comment on Russell's exercise of his rights to attend his trial and confront his accusers. The State responds that, once Russell chose to take the stand, the prosecutor and the jury could properly subject Russell's testimony to the same methods of evaluation used to assess the credibility of any other witness. Thus, the State argues, the jury could properly take into account the fact that Russell was able to prepare for trial knowing what the government's witnesses were likely to say, as well as the fact that Russell was able to prepare his own testimony after hearing what those witnesses in fact did say.

■ As explained above, "plain error" exists only when the alleged error would have been obvious to any competent lawyer and judge. There is little authority in support of Russell's position. In fact, Russell cites only one case in support of his claim that the constitution bars this type of prosecutorial comment, and that case—*State v. Cassidy*,

236 Conn. 112, 672 A.2d 899 (1996)—was decided a year after Russell's trial.

In *Marrone v. State*, 653 P.2d 672, 679 & 681 (Alaska App.1982), this court clarified that the asserted "plainness" of an error generally must be evaluated under the legal standards in existence at the time of the occurrence, not in light of later-decided cases. Therefore, the fact that Connecticut now outlaws this type of argument does not establish that plain error was committed in Russell's trial. Indeed, Russell's appellate counsel filed her opening brief without spotting this ostensibly obvious error; she sought special permission to file a supplemental brief raising this issue after she read the Connecticut court's decision in *Cassidy*. This sequence of events provides additional support for the conclusion that, if the prosecutor's argument was error, the error was not plain.

Moreover, even after *Cassidy*, there are apparently only two jurisdictions that find a constitutional flaw in this type of prosecution argument: Connecticut and the District of Columbia. *See Dyson v. United States*, 418 A.2d 127, 131 (D.C.App.1980). While we respect the decisions of these courts, "one swallow does not make a summer"[4], nor can a claim of plain error be predicated on a constitutional interpretation adopted by two jurisdictions out of fifty-one.

Finally, whatever might be the merit of a rule prohibiting this type of argument as an offensive weapon, we would still find that the prosecutor's argument was not plain error in Russell's case. In Russell's case, the prosecutor used the argument defensively in response to a claim made by Russell's attorney. The defense attorney opened up this issue by explicitly arguing that Russell's version of events should be believed because it was consistent with the testimony given by two other witnesses. In response, the prosecutor pointed out that this testimonial consistency did not necessarily prove Russell's credibility. *Compare Haakanson v. State*, 760 P.2d 1030, 1036 (Alaska App.1988), and *Rodriquez v. State*, 741 P.2d 1200, 1203–05 (Alaska App.

**4.** Aristotle, *Nicomachean Ethics*, book 1, chapter 7, *quoted in* Barlett's "Familiar Quotations"

(Emily Morison Beck, ed., 15th ed.1980), p. 87.

1987) (although the State can not use psychological profile evidence as an offensive weapon, the State is entitled to introduce profile evidence in response to a defense claim that the victim's conduct was inconsistent with a claim of sexual assault or sexual abuse).

We now turn to Russell's sentencing issues.

Russell was a first felony offender convicted of first-degree sexual assault. Russell did not use a weapon or cause serious injury to his victim. He therefore faced a presumptive term of 8 years' imprisonment. *See* AS 11.41.410(b) and AS 12.55.125(i)(1). Judge Jahnke found two aggravating factors under AS 12.55.155(c): (c)(18)(A)—that Russell's crime was committed against his spouse, and (c)(8)—that Russell had a criminal history of repeated or aggravated instances of assaultive behavior.

■■■■ On appeal, Russell challenges aggravator (c)(8). He notes that a grand jury refused to indict him for the acts of abuse that resulted in T.R.'s hospitalization in 1993. In fact, Russell had previously been convicted only once for abusing T.R., and that was a misdemeanor. Russell's argument, however, appears to be based on a misunderstanding of the aggravator. When aggravator (c)(8) speaks of a defendant's "criminal history", this includes incidents that were not prosecuted or that otherwise did not result in convictions. *Fagan v. State,* 779 P.2d 1258, 1260 (Alaska App.1989).

■■■■ Russell also argues that, if aggravator (c)(8) was proved, application of this aggravator to his case would violate "double jeopardy". Russell perceives a double jeopardy violation because one element of his offense was recklessly disregarding T.R.'s lack of consent to an act of sexual intercourse. Russell asserts that the evidence of his prior physical abuse of T.R. was the only evidence to support a finding of recklessness, and thus it would be a second jeopardy to use this same evidence to prove aggravator (c)(8).

Russell cites no cases to support his assertion that this dual use of the evidence violates the constitution, and we are aware of no such cases. We conclude that Russell's double jeopardy argument is meritless.

■■■■ Russell also relies on AS 12.55.155(e). This statute declares that an aggravating factor may not be used to enhance a defendant's sentence if that factor is a necessary element of the offense for which the defendant was convicted, or if that factor by itself requires imposition of a higher presumptive term.

Russell is incorrect when he asserts that, apart from his prior physical abuse of T.R., there was no evidence that he recklessly disregarded her lack of consent. T.R. testified that she repeatedly told Russell to stop—that she did not want to have sex with him.

More important, Russell's basic legal premise is incorrect. It does not violate AS 12.55.155(e) for the State to rely on the same evidence to prove both the charged offense and an applicable aggravating factor. AS 12.55.155(e) speaks only to those cases in which the aggravating factor is a necessary element of the offense. To prove that Russell committed first-degree sexual assault, it was not necessary for the State to prove that Russell had previously engaged in repeated or aggravated assault on T.R. Evidence of these prior assaults was relevant, but the State did not have to prove this aggravator in order to convict Russell. Thus, AS 12.55.155(e) was not violated. *See Krasovich v. State,* 731 P.2d 598, 600 (Alaska App.1987) (holding that, because negligent homicide is not invariably committed by use of a dangerous instrument, AS 12.55.155(e) does not bar the application of aggravator (c)(4) to negligent homicide cases).

■■■■ Russell next argues that Judge Jahnke should have found mitigator AS 12.55.155(d)(9)—that Russell's offense was among the least serious within its class. Russell suggests that, because his sexual assault upon T.R. "arose in a marital relationship", this may have "created confusion about intent"; Russell asserts that there was "significant evidence that Russell believed ... his wife desired intimacy with him". Whatever the evidence on this point, the jury found beyond a reasonable doubt that Rus-

sell was not confused about T.R.'s state of mind.

Russell points out that he used no weapon. However, we can not view the lack of a weapon as a mitigator: if Russell had used a weapon, he would have faced a higher presumptive term. *See* AS 12.55.125(i)(2).

Russell asserts that he did not act with "malicious intent" or with intent to harm his wife. Russell does not define what he means by "malicious intent", but we assume he is referring to some mental state more blameworthy than the recklessness required to prove first-degree sexual assault. Because proof of recklessness suffices, the fact that Russell acted without "malicious intent" does not establish his crime as being among the least serious within the definition of first-degree sexual assault. Similarly, the fact that Russell did not intend to physically harm T.R. does not establish the mitigated nature of his offense. If Russell had injured T.R., his offense would be aggravated. *Woods v. State*, 667 P.2d 184, 187–88 (Alaska 1983).

For these reasons, we uphold Judge Jahnke's rejection of mitigator (d)(9).

Russell next argues that Judge Jahnke should have referred his case to the three-judge sentencing panel under AS 12.55.165 because imposition of the 8–year presumptive term constituted manifest injustice. He points out that he had a lengthy, non-violent marriage to Rosemary Morris and that he "lived for most of his adult life as a productive [citizen]". However, Russell had a history of violence toward T.R. Judge Jahnke believed that Russell was obsessed with T.R. at the time of the rape, and he further believed that this obsession potentially continued to control Russell's thoughts even at sentencing. Judge Jahnke concluded that Russell's outlook for rehabilitation was "at best guarded", and that Russell had yet to accept responsibility for his crime. Given this record, Judge Jahnke did not abuse his discretion when he declined to send Russell's case to the three-judge panel.

Finally, Russell argues that even if both aggravators were proved, even if the mitigator was not proved, and even if Judge Jahnke properly declined to refer Russell's case to the three-judge sentencing panel, it was still unfair to "increase Mr. Russell's sentence by a factor of fifty percent" based on the aggravating factors. Judge Jahnke did not increase the 8–year presumptive term by fifty percent. He added 4 years, but he suspended them. Thus, Russell was sentenced to serve only the 8–year presumptive term mandated by statute for his crime. He faces additional jail time only if he violates the terms of his probation.

The judgement of the superior court is AFFIRMED.