**Mark C. STRUMSKY, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–8098.**

Court of Appeals of Alaska.

May 9, 2003.

---

Christine S. Schleuss, Anchorage, for Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

STEWART, Judge.

A jury convicted Mark C. Strumsky of three counts of second-degree sexual abuse of a minor.[1] Strumsky argues that the superior court erroneously admitted hearsay testimony of the victim's complaints to a friend,

---

1. AS 11.41.436(a)(2).

a teacher, a school nurse, and the detective who investigated the case. He also argues that the superior court improperly barred him from presenting evidence to show the proper context of Strumsky's admission that the victim would not lie.

From our review of the record, we conclude that the superior court did not prevent Strumsky from presenting evidence showing the context of his admission that the victim would not lie. We also conclude that the victim's statements to third parties were admissible. Therefore, we affirm Strumsky's convictions.

### Background facts and proceedings

In October 2000, Laurie Craft, a teacher at Ocean View Elementary School, showed her class a video about inappropriate touching. Ten-year-old C.B. approached Craft, told her "[S]omebody's been touching me," and then began to cry. C.B. told Craft "the neighbor" was touching her. Craft took C.B. to see Chris Boone, the school nurse.

C.B. told Boone her neighbor "Mark" had touched her "top and bottom," "four or five times." Boone testified that C.B. was very upset and "sobbing." As required by law, Boone contacted the Division of Family and Youth Services.[2]

Detective Michelle Bales of the Anchorage Police interviewed C.B. on October 19, 2000. C.B. was not upset or crying. C.B. identified her next-door neighbor, Strumsky, as her abuser. She told Bales that Strumsky abused her three separate times in his home. According to C.B., Strumsky fondled her breasts twice in two of the incidents and during the third, put his hands down her pants and fondled her genitals. C.B. reported that she had told her friend, C.K., about the abuse.

Bales obtained a *Glass* warrant[3] to record conversations between C.B.'s father and Strumsky. C.B.'s father contacted Strumsky by telephone and in person. During the recorded conversations, Strumsky repeatedly

denied any misconduct with C.B., but when asked by C.B.'s father if C.B. was lying, Strumsky responded: "No, [C.B.] doesn't lie."

The grand jury indicted Strumsky on three counts of sexual abuse of a minor.

### Were C.B.'s out-of-court statements to others inadmissible hearsay?

Moments before the jury was brought in for opening statements, Strumsky's attorney told Superior Court Judge Larry D. Card that he objected to the expected testimony of C.K., the twelve-year-old friend of C.B.'s who was scheduled to testify. The prosecutor told the judge that C.K.'s testimony was admissible under *Greenway v. State*[4] because it was a first complaint about a sexual assault. Judge Card indicated that C.K.'s testimony would be admissible if the State showed it was a first complaint. Strumsky then questioned how Craft's or Boone's testimony about C.B.'s reports would be admissible if C.K. heard the first complaint. The prosecutor responded that she expected to offer Craft's testimony to explain why Craft took C.B. to the nurse. Judge Card observed that this appeared to be a non-hearsay purpose for the evidence. The prosecutor was not sure whether Boone, the school nurse, would be called and the court did not discuss her testimony further except to note that it appeared that the nurse's testimony would not be part of the State's opening case. The State described C.B.'s interview with Detective Bales as a detailed report. Judge Card described it as an interview but did not discuss her testimony further. The parties agree that this brief discussion was sufficient to preserve a hearsay objection to testimony from C.K., Craft, Boone, and Bales.

In the State's opening statement, the prosecutor said she expected to call C.B., C.K., Boone, Craft, and Bales as witnesses. The prosecutor told the jury to pay particular attention to C.B.'s testimony "because, really, the case does rest solely on her report[.]"

---

**2.** AS 47.17.010–.020.

**3.** *See State v. Glass,* 583 P.2d 872 (Alaska 1978), *on reh'g,* 596 P.2d 10 (Alaska 1979) (holding that the Alaska Constitution requires police to obtain

judicial authorization before secretly recording a person's private conversations).

**4.** 626 P.2d 1060, 1060–61 (Alaska 1980).

For his part, Strumsky said that the case would be a "swearing contest." "That means you are going to have one person swearing to one thing, and one person swearing to another, with only other peripheral evidence." Strumsky then predicted that he would show that C.B.'s credibility was questionable: "[B]ased on her other sworn statements and unsworn statements, that were taped, these are the types of inconsistencies that I expect to come up in her testimony." Strumsky then described a laundry list of inconsistencies in C.B.'s previous statements, including where the abuse occurred, when the abuse occurred, and how many times the abuse occurred.

C.B. was the first witness called. She testified that Strumsky had fondled her breasts under her clothes two different times. She also testified that a third time, Strumsky squeezed her breasts, unzipped her pants, and rubbed her "private parts" (her term for her genitals) underneath her clothes by moving his hands back and forth. C.B. said that her friend, C.K., was the first person she told about Strumsky's conduct. She contacted Craft after seeing the "safety" video at school about good and bad touching, and then spoke to Boone, the nurse, about what happened. She also spoke to Bales after telling her parents.

Strumsky cross-examined C.B. by pointing out inconsistencies in her interview with Detective Bales, her grand jury testimony, and the testimony she had just offered to the court. Strumsky questioned her repeatedly about the difference between a truth and a lie. He asked her several times if she had told the truth when she talked to C.K. and Detective Bales. He asked her if the nurse would lie about C.B.'s report. Strumsky asked if she had told ten or fifteen different stories about the abuse.

C.K. was the next witness. C.K. testified that C.B. told her during the summer that P.S.'s father (the defendant) was "touching her from the waist down" in "inappropriate places." Under *Greenway*, a victim's first report of a sexual assault is admissible.[5]

The permissible scope of first-report evidence is discussed in several cases. In *Greenway*, the first-report evidence included the victim's complaint to her mother shortly after the July sexual assault and her complaint to a school counselor after school started in September.[6]

We first discussed the appropriate scope of this evidence in *Nitz v. State*.[7] In that case, the pre-adolescent victim's mother and a neighbor asked the victim whether anyone was abusing her.[8] The victim identified her stepfather as the perpetrator of several acts of abuse.[9] We ruled that under *Greenway*, a trial court could allow a witness to testify about reasonable details included in a first report, particularly when the identity of the perpetrator was not an issue.[10]

In *Nusunginya v. State*,[11] two witnesses testified about a child's complaint of sexual abuse by her father: the victim's ten-year-old cousin and the victim's aunt, who the victim told two days after she told the cousin.[12] We upheld the admission of the victim's statement to her cousin as a first complaint, noting that it did not provide any significant detail beyond the identity of the perpetrator.[13] We validated the discussion in *Nitz* that recognized the trial court's discretion to allow admission of details of a first complaint so that a jury may obtain a fair understanding of the context in which the complaint was made.[14] We noted that there were no witnesses to the assault and very little evidence for the jury to consider.[15] The cousin's testimony, which went no further than that of the

5.  *Greenway*, 626 P.2d at 1060–61.

6.  *Id.* at 1060.

7.  720 P.2d 55 (Alaska App.1986).

8.  *Id.* at 58.

9.  *Id.*

10.  *Id.* at 63.

11.  730 P.2d 172 (Alaska App.1986).

12.  *Id.* at 173.

13.  *Id.*

14.  *Id.* at 174.

15.  *Id.*

victim who had already testified, provided a context in which the complaint could be viewed.[16]

■ These same considerations appear to apply to the testimony of Craft and, perhaps, Boone. In *Greenway,* the court upheld the admission of the victim's complaint to the school counselor.[17] This complaint resulted in official action, as did C.B.'s contact with her teacher who immediately brought C.B. to the nurse. Both the teacher and the nurse testified at the trial after C.B. had testified, and neither witness provided significant detail of C.B.'s statement beyond a potential identification of Strumsky. According to Craft, C.B. identified "the neighbor" and, according to Boone, C.B. said her neighbor "Mark" had touched her. Both Craft and Boone described C.B.'s demeanor when she was reporting the problem: C.B. was crying and "sobbing."

Even if Craft's and Boone's testimony was not admissible under *Greenway,* we must evaluate whether their testimony is admissible as a prior consistent statement, a rationale adopted by Judge Card during trial. In *Nitz,* we addressed the admissibility of prior consistent statements in cases involving sexual abuse of children.[18] We found reversible error in that case because we concluded the trial court erroneously admitted hearsay statements of the victim as prior consistent statements.[19] We expressed particular concern about the prejudice caused when the State calls several witnesses who repeat the victim's out-of-court complaint:

> [W]here a parade of witnesses is allowed to offer evidence of prior consistent statements before the victim testifies and is impeached, the jury may be tempted to substitute the credibility of the third-party witnesses for the credibility of the victim. Because the third-party witness will often be viewed as accepting—either implicitly or explicitly—the facts asserted in the victim's prior statements, allowing them to testify and to present evidence of the prior statements out of order—before the jury is able to discern that the legitimate purpose of the evidence is to counter an attack on the victim's credibility—openly invites the jury to accept the witness' view of the victim's credibility before the victim even testifies. This class of prejudice is particularly great and is particularly susceptible to abuse in cases such as the present one: here, the evidence of guilt consisted almost entirely of the testimony of an unsophisticated and relatively inarticulate child; her prior statements were presented to the jury through a series of articulate adult witnesses, whose ranks included credentialed professionals with extensive experience in dealing with sexual assault cases.[20]

We noted that, under the traditional approach of Evidence Rule 801(d)(1)(B), a witness's prior consistent statement is admissible only under the limited circumstances of rebutting a charge of recent fabrication or improper influence or motive, and only when the prior statement was made before the witness's motive to testify falsely first arose.[21]

■ But we expanded the scope of admissibility for prior consistent statements in cases involving sexual abuse of children. While retaining the traditional rule against the admission of a witness's prior consistent statements until after that witness had testified and been impeached, we held that prior consistent statements could be admitted even when they were made after the witness's motive to testify falsely had already arisen.[22] Under *Nitz,* admissibility is predicated on an initial determination that the prior statement, regardless of when it arose, is "actually relevant to rebut an express or implied charge . . . of recent fabrication or improper influence or motive."[23] In addition, the pro-

16. *Id.*

17. *Greenway,* 626 P.2d at 1060.

18. *Nitz,* 720 P.2d at 58.

19. *Id.* at 68.

20. *Id.* at 70–71.

21. *Id.* at 64.

22. *Id.* at 67.

23. *Id.* at 68 (internal quotes omitted).

bative value of the evidence must outweigh its potential for prejudicial impact.[24] Finally, if the out-of-court statement was made after the witness's alleged motive to testify falsely had already arisen, the prior statement may be considered only for the limited purpose of determining the credibility of the witness.[25]

Here, C.B.'s statements to Craft and Boone, as well as her out-of-court statements to Bales, are admissible under the *Nitz* rationale of prior consistent statements from child sexual abuse victims. C.B. was the first witness in the case, and as Strumsky announced in opening statement, he attacked her credibility with several references to her prior statements. Although Craft's, Boone's, and Bales's testimony about C.B.'s prior consistent statements was only admissible for the limited purpose of determining C.B.'s credibility, Strumsky did not request such a limiting instruction from Judge Card. Even so, the thrust of the State's argument to the jury was that C.B.'s out-of-court statements were useful to evaluate the credibility of her testimony. Furthermore, unlike the relatively inarticulate victim in *Nitz*, the transcript of C.B.'s testimony reflects an articulate child who responded well to complicated questioning, and, if she did not understand the vocabulary or the concepts used by the lawyers, she requested clarification.

Our review of the record also shows that Judge Card could properly conclude that the probative value of the prior-consistent-statement evidence outweighed its prejudicial impact. Accordingly, we conclude that Judge Card did not abuse his discretion when he admitted C.B.'s prior consistent statements.

*Did the superior court bar Strumsky from placing his admission in context?*

While Detective Bales recorded Strumsky's conversation with C.B.'s father, Bales heard C.B.'s father ask Strumsky whether C.B. was lying and Strumsky responded, "No, [C.B.] doesn't lie." At trial, Bales testified that she heard this exchange. The State also played that portion of the tape recording. Strumsky objected and maintained that the entire recording should be played to the jury. Judge Card conceded that Strumsky was entitled to show "some context." Strumsky reiterated that he was entitled to play the entire recording of the conversation. Because he consistently denied any misconduct with C.B. during the conversation, Strumsky argued that the jury would draw an unfair inference if they heard only the single question and answer in isolation.

■ Evidence Rule 106 states that when one party introduces a part of a document or recording, an adverse party "may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."[26] The commentary to Evidence Rule 106 explains that an adverse party had the right, at common law, to introduce the remaining relevant portions of the document. The significant language in Rule 106 is the phrase "at that time":

> [When a substantial amount of] time elapses between the offer of part of a statement and the offer of the remainder, the jury may become confused or find it difficult to reassess [the] evidence that it ... heard earlier in light of [the] subsequent material. Rule 106 creates a right to require immediate admission of ... all relevant portions. It is designed to enable one party to correct immediately any misleading impression created by another party who offers part of a statement out of context.[27]

We discussed Rule 106 in *Stoneking v. State*.[28] We stated:

> The limited purpose of A.R.E. 106 is to allow a party to admit omitted portions of a partially admitted statement only when and only to the extent that the omitted portions are necessary to provide context to the admitted portions, or to explain or clarify them. The rule does not make admissible statements that would other-

**24.** *Id.*

**25.** *Id.*

**26.** A.R.E. 106.

**27.** Commentary to Alaska Evidence Rule 106.

**28.** 800 P.2d 949 (Alaska App.1990).

wise be inadmissible; it is meant only to allow contemporaneous admission of evidence that would ordinarily not be admissible until later stages of the trial.[29]

In this case, Strumsky asserted that throughout his conversation with C.B.'s father, he never admitted abusing C.B. In order to provide the context of his statement and to explain his comment about C.B.'s truthfulness, Judge Card recognized that he should be permitted to play some portion of the recording. Even though the purpose of the rule is to admit the evidence to explain the admission or to provide context, Judge Card ruled that Strumsky would not be permitted to play any of the recording until Strumsky testified in his own case.

Nothing in Evidence Rule 106 requires that a defendant testify when a defendant requests, in fairness, to admit additional portions of a recorded statement to provide context or an explanation of an admission. As the commentary to the rule indicates, the rule requires the "immediate admission" of all relevant portions. Nonetheless, Strumsky took the stand and explained the context of the tape recording. Without objection, Strumsky testified that C.B.'s father asked him repeatedly whether he had touched C.B. and that he consistently denied it.

However, after Strumsky took the stand, he did not ask Judge Card to play all or part of the recording to explain or show the context of his admission. Strumsky asserted other reasons that the tape might be played: during a portion of the conversation with C.B.'s father, the two mentioned sexual misconduct in the church C.B.'s family attended. But Judge Card pointed out that speculative evidence about other perpetrators was not a sufficient reason to play the entire tape.[30] At the end of Strumsky's direct testimony, the prosecutor asked the court under what conditions Strumsky could play the tape. The court told Strumsky that he could admit relevant portions of the tape. But Strumsky did not seek to admit the recording or any portion of it and Judge Card did not deny Strumsky's request to play the tape. Be-

cause Strumsky did not renew his request to admit the recording, he has not preserved this issue.

*Conclusion*

The judgment of the superior court is AFFIRMED.

MANNHEIMER, Judge, concurring.

MANNHEIMER, Judge, concurring.

I write separately to explain my views on the hearsay issues in this case.

C.B.'s report of sexual abuse to her school friend, C.K., was properly admitted under the "first complaint" exception to the hearsay rule. When C.B. confided in C.K., this was C.B.'s first report of the sexual abuse; moreover, C.K.'s description of the report was fairly short and did not include many details.

With regard to C.B.'s later reports to her teacher and to the school nurse, the trial judge ruled that C.B.'s statements to these two adults were admissible to establish the course of the investigation. This was a permissible basis for the testimony; but if this was the sole ground for allowing the teacher and the school nurse to testify, they should not have been allowed to give the details of C.B.'s report—only that C.B. claimed to have been sexually abused, and that they alerted the authorities.

If I were writing on a clean slate, I would be inclined to expand the "first complaint" exception to the circumstances of this case: circumstances where a child victim first confides the sexual abuse to a peer, and then later confides in an adult who is in a position to help. (In the present case, C.B.'s reports to her teacher and the school nurse took place within a span of minutes; they were essentially a single continuing report.) But even under a strict construction of the "first complaint" rule, I conclude that any error in allowing the teacher and the school nurse to recite the details of C.B.'s report does not require reversal of Strumsky's conviction.

---

**29.** *Id.* at 951–52 (citations omitted).

**30.** *See Smithart v. State,* 988 P.2d 583, 586–87 (Alaska 1999); *Marrone v. State,* 359 P.2d 969, 984–85 n. 19 (Alaska 1961).

The testimony of both the teacher and the school nurse was fairly short, and neither of them offered many details of the offense. The small detail that these two witnesses offered was nothing compared to the amount of detail contained in C.B.'s own testimony, which went on for hours and which preceded the testimony of these other witnesses.[1] Further, it is clear from the record that C.B. was a competent witness whose credibility could be judged in the same manner as typical witnesses. C.B. was not an inarticulate youngster whose account of the abuse was presented primarily through the testimony of adults.[2] Thus, any arguable error in allowing C.B.'s teacher and her school nurse to cursorily repeat C.B.'s report of sexual abuse was harmless.

This leaves the question of whether the trial judge should have admitted the testimony of Detective Bales. Strumsky's attorney objected on hearsay grounds when Bales was asked to describe C.B.'s report of sexual abuse. Because the prosecutor responded only with a general assertion that Bales's testimony would involve C.B.'s "prior consistent statement", with no indication of what particular consistent thing C.B. had said to Bales, the defense attorney's objection probably should have been sustained at that point. However, Bales's free-form description of C.B.'s report was cursory. The significant details of C.B.'s report were elicited when the prosecutor repeatedly asked Bales to describe the particular content of C.B.'s prior statement on points previously raised by the attorneys during the cross-examination and re-direct examination of C.B.

C.B. was the State's first witness. At one point during the direct examination of C.B., the prosecutor refreshed C.B.'s memory by having her read a portion of the transcript of her statement to Detective Bales. However, it was during cross-examination that C.B.'s statement to Detective Bales began to loom large in this case.

The defense attorney's first questions to C.B. were, "Do you recall when you were talked to by Michelle Bales? She had an interview with you back in November. And they taped that [interview], didn't they?" The defense attorney then launched into a cross-examination in which C.B. was repeatedly directed to refer to, and sometimes read aloud, portions of her interview with Bales and her prior testimony to the grand jury. In response to this cross-examination, the prosecutor likewise repeatedly asked C.B. to refer to her statement to Bales in order to refresh her memory during re-direct.

Later in the trial, when Detective Bales was called to testify, her testimony was to a large extent simply a continuation of the process of impeachment and rehabilitation that began when C.B. was on the stand. The prosecutor repeatedly asked Bales about the content of C.B.'s prior statement, but the prosecutor's questions were directed to the particular details that had figured prominently in the cross-examination and re-direct examination of C.B. In fact, the prosecutor's questions were so detailed that Bales could not answer from memory. Again and again—with both attorneys' blessing—Bales was forced to consult the transcript of C.B.'s statement. Indeed, when Bales's answers deviated too much from the transcript of C.B.'s statement, Strumsky's attorney objected and asked the trial judge to direct Bales to read from the transcript rather than paraphrasing or characterizing C.B.'s words.

1. *See Russell v. State*, 934 P.2d 1335, 1344 (Alaska App.1997) (holding that even if the detail offered by a "first complaint" witness exceeded the proper scope of this hearsay exception, "the error was harmless [because the victim] had already testified to all of the details mentioned by [the witness]"). *See also Kosbruk v. State*, 820 P.2d 1082, 1084 (Alaska App.1991) (noting that "there has been a marked trend toward relaxation of the traditional restrictions governing admission of evidence of the victim's first complaint", and that "[m]ore recent decisions have recognized the appropriateness, within the reasonable limits of the trial court's discretion, of allowing details of a first complaint of sexual assault to be admitted for the purpose of enabling the jury to obtain a fair understanding of the circumstances under which the complaint was made").

2. *See Horton v. State*, 758 P.2d 628, 631 (Alaska App.1988) (finding that the arguably inadmissible hearsay accounts of the victims' statements "had little impact on the case" because the adolescent victims "were competent witnesses and that the jury was able to judge their credibility").

Given these circumstances, Bales's testimony was properly admissible to establish the content of C.B.'s interview on the particular points raised during the cross-examination and re-direct examination of C.B.—not under the theory that Bales was relating C.B.'s "prior consistent statements", but rather because C.B. had been impeached with apparent inconsistencies and omissions in her interview with Bales, and Bales could clarify exactly what C.B. had said or failed to say. In other words, the primary relevance of Bales's testimony was not to assert the truth of C.B.'s prior statements, but rather to establish what those prior statements were.