Alan R. BURTON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–9686.

Court of Appeals of Alaska.

April 18, 2008.

James H. Cannon, Fairbanks, for the Appellant.

Blair M. Christensen, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Over a decade ago, Alan R. Burton was convicted of first-degree murder for shooting and killing his girlfriend, Susan Overbeck. This Court affirmed Burton's conviction on direct appeal. *Burton v. State*, Alaska App. Memorandum Opinion No. 4150 (November 17, 1999), 1999 WL 1260482.

A little over one year later, Burton initiated post-conviction relief proceedings in the superior court. In his petition, Burton argued that his trial attorney had been ineffective in various ways. Superior Court Judge Charles T. Huguelet ultimately dismissed Burton's petition for failure to state a prima facie case for relief. Judge Huguelet concluded that Burton had either failed to make a prima facie case for his attorney's incompetence, or had failed to show how his attorney's alleged incompetence might have prejudiced him. Burton now appeals the superior court's decision.

*The relationship of our decision in Burton's direct appeal to the resolution of his current claims of ineffective assistance*

Before we turn to Burton's individual claims of ineffective assistance, we must address a preliminary issue. Burton asserts that Judge Huguelet committed legal error when the judge ruled that two of Burton's claims of ineffective assistance of counsel were precluded by this Court's resolution of Burton's direct appeal.

Burton argued in his post-conviction relief petition that his trial attorney gave him ineffective assistance of counsel because she failed to object to certain portions of the testimony given by two witnesses, Dorothy Leach and Sheryl Perry. Judge Huguelet ruled that even if Burton's trial attorney was conceivably incompetent for failing to object to this testimony, Burton could not prove ineffective assistance of counsel because this Court (in Burton's direct appeal) had already ruled that the admission of this testimony was harmless beyond a reasonable doubt. *Burton*, Memorandum Opinion No. 4150 at 12–13, 1999 WL 1260482 at *6.

Similarly, Burton argued that his trial attorney gave him ineffective assistance of counsel because, at Burton's murder trial, she failed to ask for jury instructions on two lesser degrees of criminal homicide (manslaughter and criminally negligent homicide). Judge Huguelet rejected his claim in large measure because this Court had already ruled (again, in Burton's direct appeal) that "any error in failing to instruct the jury concerning [these] lesser offenses ... was manifestly harmless"—given that the jury had been instructed on second-degree murder (*i.e.*, unintentional murder) and had nevertheless convicted Burton of first-degree murder (*i.e.*, intentional murder). *Burton*, Memorandum Opinion No. 4150 at 12, 1999 WL 1260482 at *6.

In the current appeal, Burton asserts that Judge Huguelet's analysis of these two claims was flawed by a fundamental misunderstanding of the relationship between (1) an appellate court's resolution of a claim of "plain error" in a defendant's direct appeal (*i.e.*, resolution of a claim that was not preserved in the trial court because the defense attorney failed to object), and (2) a defendant's ability to argue later, in post-conviction relief litigation, that their attorney was incompetent because the attorney failed to object.

Specifically, Burton asserts that it is possible for a defendant to prove (in post-conviction relief litigation) that their attorney acted incompetently by failing to object to evidence, or by failing to object to a trial judge's action (or inaction)—even though, on direct appeal, the appellate court concluded that the attorney's failure to object was not plain error. And, based on this assertion, Burton contends that Judge Huguelet committed error when he relied on this Court's decision in

Burton's direct appeal to resolve these two claims of ineffective assistance of counsel.

Burton is partially correct. In order to explain this conclusion, we must review the definitions of "ineffective assistance of counsel" and "plain error".

Under *Risher v. State*[1] and *Strickland v. Washington*,[2] a defendant who claims ineffective assistance of counsel must prove two things: first, that their attorney acted incompetently (*i.e.*, that the attorney failed to meet the standard of performance minimally required of criminal law practitioners); and second, that this attorney incompetence prejudiced the defendant (*i.e.*, that there is at least a reasonable possibility that the result at the defendant's trial would have been different but for the attorney's incompetence).

■ Under Alaska law, an error to which no objection was preserved in the trial court will qualify as "plain error" only if (1) the error "was so obvious that it should have been noticed by the trial court *sua sponte* "[3] (*i.e.*, the error should have been apparent to any competent judge or lawyer);[4] (2) the attorney representing the party who now claims error had no apparent tactical reason for failing to object;[5] and (3) the error was so prejudicial to the fairness of the proceedings that failure to correct it would perpetuate manifest injustice.[6]

■ Given these definitions, it is clear that Burton is correct when he asserts that a finding of "no plain error" on appeal will not necessarily rule out the possibility that the defense attorney acted incompetently by failing to object.

■ A "plain error" is an act or omission that is "manifestly wrong, so wrong that any competent judge or attorney should have recognized the error and corrected it."[7] For present purposes, the crucial aspect of the plain error doctrine is that it focuses on what the *judge* should or should not have done.

True, this Court has previously remarked that plain error and ineffective assistance of counsel are essentially two sides of the same coin:

If an error is so obvious and so prejudicial that an appellate court should recognize it as "plain error" on appeal, [then] experienced, competent trial counsel should recognize it and seek its correction in the trial court by a timely objection. A finding of plain error is therefore virtually the equivalent of a finding of ineffective assistance of counsel. Rarely will one exist in the absence of the other.

*Potts v. State*, 712 P.2d 385, 394 n. 11 (Alaska App.1985).

■ But although a finding of plain error may be "virtually the equivalent of a finding of ineffective assistance of counsel", the converse is not true. There are many instances where, although an attorney may be acting incompetently, the attorney's incompetence (and any accompanying injustice) will not be obvious to the trial judge—and thus there will be no plain error.

This is the underlying premise of our decision in *Barry v. State*,[8] where we held that claims of ineffective assistance of counsel must ordinarily be litigated in post-conviction relief proceedings rather than raised as claims of plain error on direct appeal. In

1.  523 P.2d 421, 425 (Alaska 1974).

2.  466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

3.  *Carman v. State*, 658 P.2d 131, 137 (Alaska App.1983).

4.  *Russell v. State*, 934 P.2d 1335, 1343 (Alaska App.1997); *Massey v. State*, 771 P.2d 448, 453 (Alaska App.1989).

5.  *Russell*, 934 P.2d at 1344; *Massey*, 771 P.2d at 453; *Potts v. State*, 712 P.2d 385, 394 n. 11 (Alaska App.1985); *Wortham v. State*, 689 P.2d 1133, 1139 (Alaska App.1984).

6.  *Woodbury v. State*, 151 P.3d 528, 532 (Alaska App.2007); *Baker v. State*, 22 P.3d 493, 498 (Alaska App.2001); *Hosier v. State*, 1 P.3d 107, 112 n. 11 (Alaska App.2000).

7.  *Wolfe v. State*, 24 P.3d 1252, 1256 (Alaska App.2001); *see also Allen v. State*, 51 P.3d 949, 958 (Alaska App.2002); *Massey*, 771 P.2d at 453; *Carman v. State*, 658 P.2d 131, 137 (Alaska App. 1983); *Marrone v. State*, 653 P.2d 672, 675–76 (Alaska App.1982).

8.  675 P.2d 1292 (Alaska App.1984).

*Barry,* we observed that the record of the trial proceedings will seldom conclusively establish incompetent representation, because that record will rarely provide an explanation for the attorney's conduct that is challenged as deficient.[9] We addressed this issue again in *Sharp v. State,* where we explained that "[c]laims of ineffective assistance can rarely be determined from the trial record alone [because a defense] attorney's trial decisions—including which potential defenses to pursue, whether to object to the evidence offered by the government, how to cross-examine government witnesses, and whether and how to present a defense case—generally rest on considerations of strategy and trial tactics that are not directly addressed in open court." [10]

In other words, even when a party's claim of plain error is based on the assertion that their attorney incompetently allowed something to happen at trial, or that the attorney incompetently failed to request something different, the question on appeal is normally *not* whether the *attorney* acted incompetently. Instead, the question is whether, based on what the *trial judge* knew, the *judge's* failure to recognize the problem and take corrective action *sua sponte* was unreasonable or incompetent.

Thus, there will be instances where a defense attorney may have been acting incompetently, but the trial judge had no reason to know this, and for this reason the appellate court will conclude that there is no "plain error". In these circumstances, the appellate court's finding of "no plain error" will not preclude the defendant's later attempt to demonstrate the trial attorney's incompetence in post-conviction relief litigation.

■ But the situation is different when an appellate court rejects a claim of plain error, not on the basis that the trial judge had no reason to be aware of the problem, but rather on the basis that the error, although "plain" (in the sense of "obvious"), did not prejudice the defendant.

For instance, in *Kenison v. State,* 107 P.3d 335, 349 (Alaska App.2005), we acknowledged that the superior court's instruction to the jury on the meaning of "fear" was obviously wrong, but we further concluded that the error in the instruction actually favored the defendant, and thus there was no plain error—because, with regard to the defendant, this error was harmless.

Similarly, in *Norris v. State,* 857 P.2d 349, 355 (Alaska App.1993), we concluded that even though the jury instruction on second-degree murder was flawed, the error in the instruction was cured by the explanation of this point contained in the summations of the parties, and thus the error did not prejudice the defendant.

More recently, we have repeatedly held that, in felony sentencings governed by Alaska's presumptive sentencing law, a trial judge's failure to submit a proposed aggravating factor to the jury did not constitute plain error under *Blakely v. Washington*[11] when the evidence on the aggravator was not subject to reasonable dispute—in other words, when there was no reasonable possibility that a jury would have found in the defendant's favor even if the issue had been submitted to a jury. *See, e.g., Active v. State,* 153 P.3d 355, 367 (Alaska App.2007); *Milligrock v. State,* 118 P.3d 11, 17 (Alaska App.2005).

In such circumstances—*i.e.,* when an appellate court's finding of "no plain error" is based on the conclusion that the error did not harm the defendant—the appellate court's decision *is* relevant to, and potentially decisive of, any later claim of ineffective assistance of counsel. If, indeed, the defendant suffered no harm on account of the error, then even if the defendant can prove that the error was the result of attorney incompetence, the defendant will not be able to prove the second prong of the *Risher–Strickland* test (the prejudice prong).

■ We acknowledge that, when an appellate court decides a direct appeal, the appellate court will often use a test for reversible error (*e.g.,* whether the error "appreciably

9. *Id.* at 1295–96. *See also State v. Jones,* 759 P.2d 558, 565 (Alaska App.1988).

10. 837 P.2d 718, 722 (Alaska App.1992).

11. 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

affected the jury's verdict") that is less strict than the test for prejudice under the *Risher–Strickland* standard (*i.e.,* whether there is a reasonable possibility that the error affected the outcome). In such cases, if a defendant proves their attorney's incompetence in a post-conviction relief action, the defendant would then be entitled to argue that the appellate court's conclusion of "no harm" should be re-evaluated under the "harmless beyond a reasonable doubt" standard specified in *Risher* and *Strickland*.

■ Moreover, even when an appellate court uses a "harmless beyond a reasonable doubt" test for reversible error (as it must when the proved error is a deprivation of a constitutional right), a post-conviction relief litigant might still be able to show that there is good cause to re-assess the appellate court's conclusion that there was no reasonable possibility that the error harmed the defendant—for example, by showing that any competent defense attorney would have chosen a different overall litigation strategy at the defendant's trial.

But in many instances, the pleadings and proof in a post-conviction relief case will provide no reason to doubt the appellate court's earlier conclusion that any error was harmless. In such instances, even if the defendant shows that the error can be attributed to their attorney's incompetence, the superior court may still validly rely on the appellate court's conclusion of harmlessness as a basis for denying the requested relief.

Burton argues that recent decisions of the Missouri courts show that this reasoning is flawed. We disagree. In fact, our research discloses that Missouri follows the rule that we have just explained. *See Shifkowski v. State,* 136 S.W.3d 588 (Mo.App.2004).

*The superior court's rejection of Burton's claim regarding the testimony of Dorothy Leach and Sheryl Perry*

As we explained in our opinion resolving Burton's direct appeal, evidence was presented at Burton's trial that he assaulted his girlfriend, Susan Overbeck, by kicking her in the head and stomach—and that, following this assault, one of Overbeck's friends took her to the residence of Sheryl Perry.

Perry observed the bruises on Overbeck's face and back, and she spoke to Overbeck about her injuries. According to Perry, Overbeck told her that Burton had caused these bruises, and Overbeck further stated that she was afraid that Burton might kill her.

In Burton's direct appeal, he asserted that Perry's testimony about Overbeck's out-of-court statements was inadmissible hearsay. We upheld the admission of Overbeck's statement attributing her injuries to an assault by Burton (because it was an excited utterance), but we agreed with Burton that the trial judge should not have allowed Perry to relate Overbeck's statement about her fear that Burton might kill her in the future.

■ Nevertheless, we concluded that any error in admitting this statement was harmless because "[t]he danger of admitting Overbeck's ... expression of fear"—*i.e.,* the danger "that the jury might be led to speculate that Burton had done things to arouse this fear"—was alleviated by the fact that "the jury heard admissible evidence of Burton's [repeated] assaults on Overbeck". Indeed, at the end of our opinion, we addressed the cumulative effect of *all* the improperly admitted hearsay at Burton's trial, and we declared that this testimony (even considered all together) "was harmless beyond a reasonable doubt".

The State also presented the testimony of Dorothy Leach. Leach lived near Overbeck's place of work, and Overbeck would often come to Leach's house to use the telephone. After one such telephone call, Overbeck showed Leach some bruises on her back and chest. She told Leach that Burton had beaten her. She also stated that Burton was "so jealous [that] one day he [would] kill [her]".

On appeal, Burton contended that this testimony was inadmissible hearsay. We found no plain error because the defense attorney had not objected to this testimony, and because hearsay is admissible unless there is an objection.

In his post-conviction relief petition, Burton asserted that his trial attorney acted incompetently by failing to make proper objections to Perry's and Leach's testimony

about Overbeck's out-of-court statements expressing fear that Burton would kill her. He further asserted that he was prejudiced by the cumulative effect of these two statements.

When Judge Huguelet rejected this claim, he noted that this Court had found that Perry's testimony on this subject was harmless beyond a reasonable doubt. Judge Huguelet pointed out (correctly) that this Court had not directly addressed the question of whether the *combined* effect of Perry's and Leach's testimony on this subject might have created a greater degree of prejudice. However, Judge Huguelet also pointed out that we had explained our basis for concluding that Burton was not prejudiced by Perry's testimony, and Judge Huguelet then declared that "there [was] no reason why the same reasoning would not apply to Leach's testimony".

In other words, Judge Huguelet rejected Burton's claim of ineffective assistance, not because he believed that our discussion of prejudice was conclusive on this issue, but rather because Burton failed to present any reason to re-assess our earlier conclusion of harmlessness (which, strictly speaking, applied only to Perry's testimony), nor any reason to believe that the testimony of Perry and Leach on this issue, even taken in combination, was any more prejudicial than Perry's testimony alone.

In his current appeal to this Court, Burton contends that Judge Huguelet was wrong to dismiss this claim, but most of his argument is devoted to the proposition that his trial attorney was incompetent for failing to object to the hearsay presented by Perry and Leach. This issue is moot; Judge Huguelet's dismissal of this claim was not premised on Burton's failure to plead a prima facie case of attorney incompetence, but rather on Burton's failure to show any reason to believe that this alleged incompetence prejudiced him.

On the issue of prejudice, Burton's argument consists of a single conclusory sentence: "Burton's allegation of ineffectiveness on this issue was well pled and should not have been

dismissed on the pleadings before he had a chance to depose his ... trial counsel."

But Burton offers no explanation of why he believes that his attorney's deposition might have advanced his contention that he was prejudiced by Perry's and Leach's challenged testimony. Moreover, as we recently explained in *LaBrake v. State*,[12] Burton's allegation of prejudice was not "well pled"—at least, not in the sense that Judge Huguelet was obliged to assume the truth of this allegation.

Burton's only assertion that he was prejudiced by his trial attorney's failure to object to this testimony is contained in a single sentence of the affidavit that Burton submitted in support of his application for post-conviction relief. That sentence reads, "I believe [that my trial attorney's] failures regarding the hearsay allowed at trial were the direct cause of my conviction, and constituted flagrant ineffective assistance of counsel."

This was not enough to survive a motion for judgement on the pleadings or a motion for summary judgement. We held in *LaBrake* that even though the superior court must, at this stage, presume the truth of all well-pleaded assertions of fact in a defendant's petition for post-conviction relief, "this presumption does not apply to [a defendant's] assertions concerning the legal effect or categorization of the underlying occurrences ..., nor does the presumption apply to [a defendant's] conclusory assertions concerning the ultimate facts to be decided." 152 P.3d at 480–81.

In sum, Judge Huguelet properly concluded that Burton failed to present even a prima facie case that the admission of this challenged testimony made any possible difference to the outcome of Burton's trial.

*The superior court's rejection of Burton's claim regarding his trial attorney's failure to ask for jury instructions on the lesser offenses of manslaughter and criminally negligent homicide*

Burton was indicted for first-degree (*i.e.,* intentional) murder. At Burton's trial, the State took the position that Burton blud-

---

**12.** 152 P.3d 474, 480 (Alaska App.2007).

geoned Overbeck, then stabbed her, and then finally shot her with a shotgun, with the intention of killing her.

Burton took the stand and asserted that he had been attempting to save Overbeck's life, not kill her. Burton testified that Overbeck was distraught and was threatening to commit suicide with the shotgun—so Burton intervened and tried to wrest the shotgun from her control. Burton asserted that, during the struggle for control of the shotgun, the weapon accidentally discharged and mortally wounded Overbeck.

To support Burton's contention that Overbeck's death was an accident, the defense attorney relied not only on Burton's testimony but also on the State's forensic evidence, which the defense attorney contended was equally consistent with Burton's innocence as with his guilt. The defense attorney also relied on Burton's conduct and reactions following the shooting. It was Burton who called 911 to summon police and medical assistance. And, as shown by the 911 tape, Burton urged Overbeck—who was still alive—to "hang on" until help arrived. Burton also stated that he wanted to kill himself. Finally, the defense attorney relied on the fact that, even though Overbeck survived for approximately 40 minutes after the shooting, she never accused Burton of shooting her.

When the parties initially discussed the possibility of jury instructions on lesser included offenses, the prosecutor asked the superior court to instruct the jury on all three lesser degrees of criminal homicide: second-degree murder, manslaughter, and negligent homicide. Burton's attorney opposed any instructions on these lesser offenses; she contended that Burton was either guilty of first-degree murder or he was guilty of nothing, and the jury should be put to this choice.

After hearing these competing positions, the trial judge ruled that the evidence supported one reasonable alternative between first-degree murder and acquittal: the conclusion that Burton was guilty of second-degree murder. The trial judge essentially agreed with the defense attorney's position that the evidence allowed only two reasonable conclusions: either (1) Burton intention-

ally shot Overbeck, or (2) the shooting was an accident that occurred while Burton was trying to save Overbeck, and there was no crime. However, the judge apparently concluded that the jury could reasonably find that, even though Burton intentionally shot Overbeck, he did not do so with the intent of killing her. (When a homicide results from a purposeful attack, "intent to kill" is the element that generally distinguishes first-degree murder from second-degree murder. *Compare* AS 11.41.100(a)(1)(A) *with* AS 11.41.110(a)(1)-(2).)

Thus, the jury was instructed on both first-degree (intentional) and second-degree (unintentional) murder. The jurors found Burton guilty of first-degree murder; that is, they found that Burton not only purposely shot Overbeck, but that he acted with intent to kill.

In his direct appeal, Burton argued that the trial judge should have instructed the jury on manslaughter and criminally negligent homicide. We rejected that argument for two reasons.

First, the defense attorney conceded (when questioned by the trial judge) that, given the evidence in the case, there was no version of facts that would realistically support a verdict of either manslaughter or criminally negligent homicide. Thus, this claim of error was not preserved.

Second, we concluded that any potential error was harmless—since the jury was given the opportunity to find that Burton acted without intent to kill, and they rejected that conclusion. (This was demonstrated by the jury's decision to convict Burton of first-degree murder rather than second-degree murder.) Given the evidence in Burton's case, the jury's decision that Burton acted with the intent to kill meant that the jury could not reasonably have found him guilty of either manslaughter or criminally negligent homicide.

(The evidence in Burton's case gave no reason to believe that he committed voluntary manslaughter—*i.e.*, no reason to believe that Burton intentionally killed Overbeck after she subjected him to serious provocation

that prompted him to kill her in the heat of passion.) [13]

■ In his petition for post-conviction relief, Burton asserted that his trial attorney was incompetent for deciding to litigate Burton's case in this fashion—*i.e.*, for allowing the case to go to the jury with only three verdict choices: first-degree murder, second-degree murder, or acquittal. Burton asserted that "no reasonably competent defense counsel would have adopted [this] position", and that "[t]he risk of a conviction for murder [was] far too great to warrant an all-or-nothing gamble with a client's life."

To support this assertion of incompetence, Burton's post-conviction relief attorney presented affidavits from two experienced defense attorneys, Geoffry Wildridge and Michael Dieni. Both of these attorneys stated that, in any case involving the accidental discharge of a firearm, they would ask for jury instructions on manslaughter and criminally negligent homicide.

Mr. Wildridge's affidavit is worded in a way that does not directly assert that any other approach would be incompetent. Rather, Wildridge merely stated that his personal approach is to "err on the side of caution" and ask for jury instructions on any potential lesser offenses. Mr. Dieni, on the other hand, made the more forceful assertion, "It is difficult to imagine an accidental discharge case involving a defendant handling a gun where the lesser-included offense of negligent homicide would not be requested."

However, neither Wildridge's nor Dieni's affidavit addresses the litigation choices facing a defense attorney given the particular facts of Burton's case. Both Wildridge and Dieni focus their discussion on cases where the defense claim is that the firearm discharged accidentally because of a physical defect, or because the defendant was handling it carelessly—either under the mistaken belief that the gun was not loaded, or because the defendant was too intoxicated to handle firearms safely, or because the defendant was recklessly and unjustifiably pointing the gun at another person. Neither of the attorneys' affidavits addresses, or shows

any awareness of, Burton's testimony that he took hold of the weapon only because he was attempting to interrupt an active suicide attempt.

In Judge Huguelet's decision dismissing this claim of ineffective assistance, he noted that Wildridge's affidavit did not assert that Burton's trial attorney's approach to the case was incompetent, and he further noted that Dieni's affidavit (which did contain such an assertion) was addressed to cases that were factually dissimilar to Burton's case. Thus, Judge Huguelet concluded, neither affidavit provided good reason to believe that Burton's trial attorney's litigation strategy was incompetent.

But Judge Huguelet declared that the "most convincing[ ]" reason for rejecting Burton's allegation of ineffective assistance was this Court's conclusion (on direct appeal) that any error was harmless (because the jury received an instruction on second-degree murder, but the jurors nevertheless found Burton guilty of intentional murder). Based on this Court's conclusion that Burton had not been harmed by the absence of jury instructions on manslaughter or criminally negligent homicide, Judge Huguelet concluded that even if Burton's trial attorney had conceivably acted incompetently in failing to pursue jury instructions on these lesser offenses, Burton had still failed to present a prima facie case that he was prejudiced by his trial attorney's decision.

In this appeal, Burton argues that it was error for Judge Huguelet to base his decision on this Court's finding of "no harm" in Burton's direct appeal. Burton is partially correct. In this situation, Judge Huguelet could not ignore the issue of attorney incompetence and rely solely on this Court's earlier conclusion of harmless error. As we explained in the first section of this opinion, if Burton presented a prima facie case that his trial attorney's overall trial strategy was incompetent—*i.e.*, a prima facie showing that all competent defense attorneys would have chosen a different overall litigation strategy—then this would constitute good cause to re-assess this Court's conclusion that Burton was not

**13.** *See* AS 11.41.115.

harmed by the absence of the jury instructions on manslaughter and criminally negligent homicide.

Thus, the true underlying issue is whether Burton presented a prima facie case that his trial attorney was incompetent for choosing this litigation strategy. We have examined the record, and we conclude that Burton failed to present a prima facie case that his trial attorney's litigation strategy was incompetent. (The adequacy of Burton's petition and supporting documents to survive a motion for judgement on the pleadings is a question of law; we therefore review it *de novo*.) [14]

In support of the assertion that Burton's trial attorney chose an incompetent litigation strategy, Burton's post-conviction relief attorney submitted the two affidavits from attorneys Wildridge and Dieni. But, as noted above, these two affidavits do not address the facts of Burton's case, and the kinds of cases that Wildridge and Dieni do discuss are substantially different from Burton's.

In addition to these two affidavits, Burton's post-conviction relief attorney submitted a list of ten proposed different ways of defending Burton's case—ways that at least conceivably would have warranted jury instructions on manslaughter and/or criminally negligent homicide. But these ten alternative litigation theories are all premised on one of two assertions: either that Burton was criminally negligent or reckless for having a loaded weapon accessible in his home when he had reason to believe that Overbeck was suicidal, or that Burton was criminally negligent or reckless for trying to wrest control of this weapon from Overbeck (rather than leaving Overbeck to carry out her threat to kill herself, or merely trying to talk her out of it).

Some of these ten suggested alternative litigation strategies are plausible ways of arguing Burton's case. But in light of Burton's

trial testimony (coupled with his arguably exculpatory actions after Overbeck was shot, as described above), none of these ten alternative strategies stands out as significantly better than the litigation strategy that Burton's trial attorney pursued.

Moreover, the ultimate issue is not whether one or more of these ten suggestions is arguably better, or even significantly better, than the strategy that Burton's trial attorney pursued. Rather, the issue is whether the litigation strategy adopted by Burton's trial attorney is so much worse that no competent defense attorney would have chosen it.

Having carefully examined the pleadings in this case, we conclude that Burton failed to present a prima facie case that his trial attorney's litigation strategy was incompetent. Judge Huguelet could therefore properly dismiss this claim for post-conviction relief.

*The superior court's rejection of Burton's claim regarding his trial attorney's preparation and presentation of the testimony of Thomas Vogel, the defense firearms expert*

At Burton's trial, his attorney presented the testimony of a firearms expert, Thomas Vogel. Vogel examined the shotgun shell retrieved from the weapon that killed Overbeck, and he noted that the impression left by the firing pin on this shotgun shell was off-center—which suggested to Vogel that a deforming pressure was being exerted on the breach block of the weapon at the time it discharged. Vogel told the jury that he tested a similar shotgun (*i.e.*, a shotgun of the same make and model) in his shop, and that he was able to reproduce this off-center impression by exerting pressure on the breach block with his fingers. In other words, Vogel's testimony supported the defense contention that the shotgun had discharged by accident during a physical struggle for control of the weapon.

---

14. *See Greywolf v. Carroll*, 151 P.3d 1234, 1240 (Alaska 2007) ("[an appellate court] review[s] a grant of summary judgment *de novo*"); *Allstate Insurance Co. v. Teel*, 100 P.3d 2, 4 (Alaska 2004) ("[an appellate court] review[s] a grant of a motion for judgment on the pleadings *de novo*"); *Alakayak v. British Columbia Packers, Ltd.*, 48 P.3d 432, 448 (Alaska 2002) (explaining that appellate review of these matters is *de novo* because the appellate court is "in virtually the same position as the trial court in its ability to assess the adequacy of the pleadings") (quoting *Gamble v. Northstore Partnership*, 907 P.2d 477, 482 (Alaska 1995)).

■ In Burton's petition for post-conviction relief, he asserted that his trial attorney was incompetent in her preparation of Vogel's testimony because she failed to ask Vogel to test the actual weapon that killed Susan Overbeck, and instead allowed Vogel to perform his testing on another shotgun of the same make and model (*i.e.*, another Mossberg 500).

But in her responding affidavit, the trial attorney explained why she had Vogel testify as he did. The trial attorney explained that she originally discussed the case with another firearms expert, Lucien C. Haag, who had been retained by the Public Defender Agency "to examine the weapon [and] ammunition" in Burton's case. However, after Haag conducted his analysis of this weapon and ammunition, he informed the trial attorney that he "would not be a particularly helpful witness"—because he could not provide forensic corroboration of Burton's account of the shooting.

After Haag declared that he could not give testimony to support Burton's account, the trial attorney turned to Vogel (who was the owner of a gun shop) to see if he could corroborate Burton's contention that the shotgun fired accidentally when it struck a bedpost while Burton was trying to wrest the gun from Overbeck. As it turned out, Vogel was also unable to corroborate Burton's account. However, as explained above, when Vogel tested a shotgun of the same make and model, the result of his testing suggested that the weapon in Burton's case had potentially been subjected to a deforming pressure when it discharged—thus at least partially corroborating Burton's testimony that the shotgun had fired during a struggle for control of the weapon.

Further, Vogel testified that it was possible for a weapon of this make and model to discharge without an active pull on the trigger "if it was jarred or hit hard enough".

Given the trial attorney's explanation of this matter, Burton's petition failed to present a prima facie case of attorney incompetence.

■ Burton also argued that his trial attorney was incompetent because, during Vogel's testimony, the trial attorney failed to ask Vogel to explicitly state that the result of his testing was at least consistent with Burton's testimony that the weapon had discharged during a struggle for control of the weapon. But Burton does not explain how it would have appreciably helped the defense case to have Vogel make this assertion in his testimony, as opposed to having the trial attorney draw this obvious conclusion during her argument to the jury.

On appeal, Burton asserts an additional complaint about his trial attorney's performance. He contends that his trial attorney should not have relied on Vogel's testimony at all—because (according to Burton) the manner in which Vogel reproduced the off-center firing pin impression (by exerting pressure with three fingers on the breach block) was such an unusual way to hold the weapon that Vogel's conclusion failed to lend any credence to Burton's defense theory. Burton did not raise this contention in the superior court; it is not found in either his original petition, his amended petition, or his "supplement" to these petitions. Accordingly, this additional claim is not preserved for appeal.

*The superior court's rejection of Burton's claim regarding his trial attorney's cross-examination of Robert Shem, the government's firearms expert*

At Burton's trial, firearms expert Robert Shem testified for the prosecution. Shem concluded, from the physical evidence, that the muzzle of the shotgun was at least two feet, and perhaps three feet, from Overbeck's body when the weapon discharged. Shem's testimony on this issue tended to disprove Burton's account of how the shooting occurred.

In his petition for post-conviction relief, Burton argued his trial attorney was incompetent for failing to cross-examine Shem in such a way as to impeach this testimony. In her responding affidavit, Burton's trial attorney stated that "[her] cross[-]examination of ... Shem could have been better." However, the question is whether her cross-examination of Shem was incompetent.

The record shows that Burton's trial attorney *did* cross-examine Shem about some of his conclusions. In particular, the trial attorney attempted (through her cross-examination of Shem) to develop additional support for Vogel's theory about the significance of the off-center firing pin impression.

During her cross-examination of Shem, Burton's trial attorney pointed out that when Shem test-fired the shotgun in his laboratory, three out of five test firings resulted in a normal, centered firing pin impression. Moreover even though the other two firing pin impressions were "a little bit" off-center, they were not off-center to the same extent as the impression found on the fatal shotgun shell. Thus, the trial attorney's cross-examination of Shem suggested that Vogel was correct when he attributed the off-center impression on the fatal shell to a deforming force exerted on the weapon.

In the current appeal, Burton argues that his trial attorney could have asked more questions (1) to conclusively establish that the distance between the muzzle and Overbeck's body could not have exceeded three feet, and (2) to point out that, even though Shem's testing established the muzzle distance as between two and three feet, Shem could not say exactly where (within this range) the muzzle had been.

These suggestions do not constitute a prima facie case of attorney incompetence.

*Conclusion*

For the reasons explained here, we AFFIRM the superior court's dismissal of Burton's petition for post-conviction relief.